Steve G. ERICKSON, Plaintiff-Appellee,

v.

Michael S. BLAIR and the Avon
Metropolitan District,
Defendants-Appellants.

No. 82SA351.

Supreme Court of Colorado,
En Banc.

Oct. 11, 1983.

Rehearing Denied Oct. 31, 1983..

Kelly & Stovall, Lawrence J. Kelly, Eagle, for plaintiff-appellee.

George Rosenberg, Avon, Davis, Graham & Stubbs, Thomas S. Nichols, Margaret G. Leavitt, Denver, for defendants-appellants.

QUINN, Justice.

Michael S. Blair and the Avon Metropolitan District appeal from a judgment of the District Court of Eagle County declaring Steve G. Erickson the winner of an election for a seat on the Avon Metropolitan District Board of Directors (Board). The election judges had certified Erickson as the winner of the election, but the Board, after canvassing and recounting the votes, included seven additional absentee ballots rejected by the judges in the final tally and declared Blair the winner. The district court, applying a standard of strict statutory compliance for absentee voting, held that the seven absentee ballots should not have been counted and accordingly reversed the decision of the Board and declared Erickson the winner of the election. Concluding that the district court applied an unnecessarily strict standard of electoral review, we affirm in part, reverse in part, and remand for further proceedings.

I.

The Avon Metropolitan District (District), located in Eagle County, Colorado, is a special metropolitan district organized pursuant to the Special District Act.[1] Sections 32–1–101 to 32–1–1307, C.R.S.1973 (1982 Supp.). On May 4, 1982, the District held a regular election to fill four vacancies on its Board of Directors. Seven candidates, including Erickson and Blair, were vying for three four-year terms on the Board, and one candidate was running uncontested for a two-year term.

---

1. A "special district" means "any quasi-municipal corporation and political subdivision organized or acting pursuant to the provisions of this article" of the Special District Act. Section 32–1–103(20), C.R.S.1973 (1982 Supp.). A "metropolitan district" is a special district which provides for its inhabitants two or more of the following services: fire protection, mosquito control, parks and recreation, safety protection, sanitation, street improvement, television relay and translation, transportation, or water. Section 32–1–103(10), C.R.S.1973 (1982 Supp.).

Although formal voter registration is not necessary for special district elections, the Special District Act requires in-person voters to sign an affidavit at the polling place on the day of the election and absent voters to sign an affidavit on the return envelope for their ballot.[2] An elector may apply either orally or in writing for an absent voter's ballot not earlier than thirty days before the election or later than 4:00 p.m. on the Friday immediately preceding the election.[3] Section 32–1–821(4), C.R.S.1973 (1982 Supp.), provides, in this respect, as follows:

"The return envelope for the absent voter's ballot shall have printed thereon an affidavit containing a statement of the qualifications for an elector, and it shall contain a space for the person's name, address, and signature, and the date of election. The voter shall sign the affidavit stating that he is an elector of the district and that he has not previously voted at said election."

An elector is defined in section 32–1–103(5), C.R.S.1973 (1982 Supp.), as follows:

"(a) 'Elector' means a person who, at the designated time or event, is qualified to vote in general elections in this state and:

(I) Who has been a resident of the special district or the area to be included in the special district for not less than thirty-two days; or

(II) Who, or whose spouse, owns taxable real or personal property situated within the boundaries of the special district or the area to be included in the special district, whether said person resides within the special district or not.

"(b) A person who is obligated to pay taxes under a contract to purchase taxable property situated within the boundaries of the special district shall be considered an owner within the meaning of this subsection (5)."

In the instant case, the following form of affidavit was contained on the return envelopes issued to those applying for an absent voter's ballot:

"STATE OF COLORADO )      RECEIVED BY SECRETARY
                  ) ss   _____ o'clock ___ M.
County of _____ )    _____ 19_
                         Delivered by
                         Name _____
                         Address _____

"I, _____
of lawful age, being first duly
sworn, upon my oath, depose
and say:

"That I am a person qualified to vote at a general election in the State of Colorado, and (Indicate applicable phrase by placing a cross ☒ in the box preceding the appropriate words.)

☐ "I have been a resident of the _____ District, _____ County, Colorado or the area to be included in the district for not less than thirty-two (32) days.

☐ "I (or my spouse) own taxable real or personal property within the _____ District, _____ County, Colorado, or the area to be included in the district.

☐ "I am obligated to pay general taxes under a contract to purchase real property within the district.

"That I reside at _____ ; and that I have not previously voted at the election of Directors held on _____ , 19 ___ .

_____
Elector's Signature"

Immediately after the polls closed on May 4, 1982, the election judges proceeded to count the votes cast.[4] The judges rejected

---

**2.** Section 32–1–103(5)(c), C.R.S.1973 (1982 Supp.), states that "[r]egistration to vote pursuant to the general election laws or any other laws shall not be required" to vote in a special district election. Section 32–1–804(2), C.R.S. 1973 (1982 Supp.), requires in-person voters to sign an affidavit which must be "on a form that contains the qualifications for voting at the election, a space for the person's name, address, and signature, and a space for the date of election" and which must also state that the voter "has not previously voted at said election."

**3.** Section 32–1–821(3), C.R.S.1973 (1982 Supp.).

**4.** Prior to a special district election, the Board appoints three or, in its discretion, four election judges for each precinct. Section 32–1–808(1), C.R.S.1973 (1982 Supp.). These election judges receive the voter affidavits, maintain a poll book of electors, supervise the actual voting, count the votes upon completion of the election, and issue a certificate of returns to the Board certifying the results of the election. Sections 32–1–812 and 32–1–816, C.R.S.1973 (1982 Supp.).

the seven absentee ballots in question here because, in their view, some part of the affidavit had not been properly completed. The election judges then issued a certificate of returns declaring that Erickson had received 81 votes and Blair 73 votes for the third Board seat.

Under the Special District Act, the Board oversees "the conduct of all . . . regular and special elections of the special district" and "render[s] all interpretations and make[s] all decisions as to controversies or other matters arising in the conduct of such elections." Section 32–1–803(1), C.R.S.1973 (1982 Supp.). Pursuant to statutory authorization, the Board conducted a canvass and recount on May 7, 1982. After examining the ballot envelopes, the Board concluded that eleven additional absentee ballots, including the seven ballots rejected by the election judges, should be counted in the final tally. The Board added these eleven votes to the previous totals and certified that Blair, an incumbent member of the Board, had received 83 votes to 82 votes for Erickson.

On June 7, 1982, Erickson filed a timely statement of intent to contest the election in the District Court of Eagle County on the ground that the eleven absentee ballots did not comply with the statutory requirements for absentee voting.[5] Blair and the District filed an answer and counter-statement, and the matter was set for trial. Prior to trial the parties stipulated that the eleven absent voters were in fact qualified to vote in the district and had properly submitted an absentee ballot application, which required a listing of the voter's address and the date of election for which the ballot was sought. It was undisputed that no person involved in the election had engaged in fraud or other wrongdoing.

The evidence at trial was basically undisputed. Four of the contested affidavits were those of two married couples—Ronald D. and Joyce A. Allred and Forrest H. and Maria F. Faulconer—who had voted on numbered ballots which had been issued to the respective spouses instead of the numbered ballots issued to them individually. The district court held that the Board correctly counted these four ballots because the corresponding envelope affidavits had been completed in compliance with the statutory requirements for absentee voting in section 32–1–821(4), C.R.S.1973 (1982 Supp.). The seven absentee ballots ultimately rejected by the court fell into various groupings.[6] Two voters, David and Diane E. Doyle, failed to write the election date and address on the affidavit form. In addition, the Doyles failed to check one of the three boxes designating the basis upon which they were entitled to vote, although they did write in the word "Eagle" in the following qualification category: "I (or my spouse) own taxable real or personal property within the _____ District, Eagle County, Colorado, or the area to be included in the district." Three voters—April R. Nottingham, Brian L. Nottingham, and Duane Piper—placed an "X" in the taxable property category of voter qualification and

The trial evidence indicated that on the day of the election the election judges noticed considerable voter confusion in completing the in-person voter affidavits. One election judge testified that nearly three quarters of the voters required assistance in filling out the forms. Another election judge felt that at least one-half of the voters needed help. Blair introduced over twenty in-person affidavits allegedly containing errors or erasures. Although these difficulties with the in-person voter affidavits do not affect in any way the integrity of the in-person votes, especially since the election judges were satisfied that all in-person voters were qualified to vote, these difficulties do attest to the ambiguous and confusing nature of the affidavit form.

5. The Special District Act requires that a verified petition to contest an election be filed within thirty days of the canvass by the board of directors. Section 32–1–828(1), C.R.S.1973 (1982 Supp.). Blair filed his petition on June 7, 1982, after the May 7, 1982 canvass. Although filed on the thirty-first day after the canvass, Blair's petition was timely because the thirtieth day after the canvass, June 6, was a Sunday. See section 32–1–801(3), C.R.S.1973 (1982 Supp.).

6. Each of the seven affidavits bore sealed acknowledgements by a notary public which read as follows: "Subscribed and sworn to before me this ___ day of _____, A.D. 19___."

filled in the blank lines in that category, but failed to complete the address and election date blanks on the affidavit form. Another voter, James J. Collins, had checked the residency box as a basis for his qualification to vote, but listed a Vail address, outside the district, in the appropriate space at the bottom of the affidavit. Finally, Barbara Koch had crossed out entries made in the blank lines for her address and date, and although she signed her name on the first name identification line on the affidavit form, she failed to sign her name on the line at the bottom of the affidavit designated "Elector's Signature."

The court rejected the seven ballots because the absent voter affidavits did not comply with those statutory provisions in section 32–1–821(4) relating to "a statement of the qualifications for an elector," "a space for the person's name, address,[7] and signature, and the date of election," and the voter's signed statement "that he is an elector of the district and that he has not previously voted at said election." Since the court upheld the Board's decision to count four of the absentee ballots, a ruling not challenged on this appeal, the court assumed that Blair had received these four absentee votes. Proceeding from this assumption, the court then determined that Blair[8] could only have received 77 votes and that Erickson, who was assured of 81 uncontested votes, was the winner of the election.

■ Blair and the District claim that the trial court erroneously applied a strict compliance standard in holding that the defects in the seven affidavits required automatic disqualification of the absent voter ballots. We find their claim meritorious and conclude that where, as here, there is neither claim nor proof of fraud, undue influence, or intentional wrongdoing in the election, the appropriate standard in determining the validity of absent voter ballots is whether the absent voter affidavits substantially comply with the statutory requirements for absentee voting.

## II.

■ The rule of strict compliance has its origin in *Bullington v. Grabow*, 88 Colo. 561, 298 P. 1059 (1931). In that case the court upheld a 1929 absentee voting law against a claim that it contravened the "purity of elections" clause of Article VII, Section 11 of the Colorado Constitution and then, noting that absentee voting legislation should be strictly construed, rejected the ballots of absent voters who apparently had failed to execute their absent voter affidavit.[9]

---

**7.** In the course of its ruling the district court concluded that the address space at the bottom of the affidavit was "grossly ambiguous" in that it did not specify whether the voter was to list his address within the district or his permanent residence. If a voter had merely omitted filling in the address line but had correctly completed the affidavit in all other respects, the court was not inclined to invalidate the ballot on that basis alone. The court, however, then went on to mention the "address" omission along with other irregularities in invalidating several of the seven ballots at issue here. Since the court, therefore, ultimately did attribute some significance to the "address" omission, we discuss it later in the context of those affidavits which did not include the voter's address.

**8.** The statutory procedures for voting with paper ballots, which were used in this case, are necessarily structured toward preserving the secrecy of the voter's individual ballot. *See generally* section 32–1–814, C.R.S.1973 (1982 Supp.). The district court's reliance on an assumption, therefore, is quite understandable in view of the statutory scheme. The only figures available to the district court were the results certified by the election judges (81 votes for Blair and 73 votes for Erickson) and the figures certified by the Board after the recount (83 votes for Erickson and 82 votes for Blair). Since the ballots must be preserved for purposes of an election contest, the district court has an adequate basis on remand to enter any appropriate orders with respect to the ultimate resolution of the election controversy. Section 32–1–830(1), C.R.S.1973 (1982 Supp.), authorizes the court in resolving an election controversy "to make and enter orders and judgments and issue the writ of process of such court to enforce all such orders and judgments."

**9.** Subsequent to *Bullington* this court in *City of Aspen v. Howell,* 170 Colo. 82, 89, 459 P.2d 764, 767 (1969), and in *Jardon v. Meadowbrook-Fairview Metropolitan District,* 190 Colo. 528, 533, 549 P.2d 762, 766 (1976), repeated the rule of strict construction but did not expressly rely upon it as the controlling principle in either case.

While *Bullington* was a proper decision on the facts before the court, we believe that the opinion should not be read to imply that *any* irregularity in an absent voter affidavit requires automatic disqualification of the absentee ballot. The *Bullington* court, although rejecting the argument that the statutory requirements for absentee voting were merely directory and therefore could be disregarded, did not consider whether the more flexible standard of substantial compliance might be more in keeping with the predominant goal of absent voter legislation. That goal, as recognized in *Bullington,* was to permit "a fuller expression of public opinion at the ballot box." 88 Colo. at 564, 298 P. at 1060 (quoting *Jenkins v. State Board,* 180 N.C. 169, 178, 104 S.E. 346, 351 (1920)). To hold that the failure of an absent voter to execute an affidavit invalidates his or her ballot does not necessarily mean that any deviation whatever from absentee voting legislation should likewise be fatal to an absentee ballot. There are degrees of noncompliance and this case squarely presents the court with the choice of alternative rules in assessing the extent to which noncompliance should invalidate an absent voter's ballot. A strict compliance standard, in our view, would unduly infringe upon the suffrage rights of qualified absentee voters. We therefore conclude that substantial compliance, rather than strict compliance, is the appropriate standard for evaluating the validity of absent voter ballots.

A.

Absentee voting legislation enables electors, including the physically incapacitated and those who anticipate that they will be away from the district on election day, to cast a ballot in a different manner than voters who present themselves at polling places on the day of election. Two reasons have generally been offered to support the strict construction of absentee voting legislation. The first justification stems from the notion that absentee voting is not a right but rather is a mere privilege. *See Bell v. Gannaway,* 303 Minn. 346, 227 N.W.2d 797 (1975). This notion is based on the premise that the constitutional right of suffrage means the right of a qualified elector to cast a ballot in person at a designated polling place on the day of election. Since, under this view, absentee voting legislation grants voters something to which they are not constitutionally entitled, strict compliance is nothing more than a reasonable *quid pro quo* for this legislatively granted privilege. The second justification for the rule of strict construction is rooted in the legislature's duty to safeguard the purity of elections. *See Bullington v. Grabow, supra.* The prevention of election fraud, it is argued, requires rigid adherence to the statutory conditions for absentee voting especially since, in contrast to in-person voters, absent voters are unable to respond to inquiries from election judges about their status as qualified voters.

We believe the time has come to interpret absentee voting legislation in light of the realities of modern life and the fundamental character of the right of suffrage. We live in a society which, to a great extent, depends upon mobility as an indispensable condition of progress. Many persons for legitimate reasons cannot be physically present at a polling place to cast their ballots on the day of election. These electors, no less than in-person voters, should be able to present their views on issues of public importance without being encumbered by an unyielding standard of statutory exactitude. Moreover, the right to vote is a fundamental right of the first order. *Jarmel v. Putnam,* 179 Colo. 215, 499 P.2d 603 (1972). Absentee voting legislation should not be construed in a manner that unduly interferes with the exercise of this right by those otherwise qualified to vote. *See In re Interrogatories of the United States District Court,* 642 P.2d 496 (Colo. 1982). Nor should the exercise of the voting right be conditioned upon compliance with a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters. A rule of strict compliance, especially in the absence of any showing of fraud, undue influence, or intentional wrongdoing, re-

sults in the needless disenfranchisement of absent voters for unintended and insubstantial irregularities without any demonstrable social benefit. We agree with the observations of the Florida Supreme Court in this respect:

> "The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or we risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right." *Boardman v. Esteva,* 323 So.2d 259, 263 (Fla.1975), *appeal dismissed,* 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976).

*See also Serna v. Enriquez,* 545 S.W.2d 281 (Tex.Civ.App.1976); *Lanser v. Koconis,* 62 Wis.2d 86, 214 N.W.2d 425 (1974). We reject the rule of strict compliance and adopt a standard of substantial compliance which, in our view, is adequate to the task of both preventing fraud in elections and preserving the absent voter's right of suffrage against unnecessary and technical restrictions. *See* section 32–1–834, C.R.S.1973 (1982 Supp.) (liberal construction required to permit all legally qualified voters to vote and to prevent fraud and corruption in special district elections).

### B.

■ Specific provisions of the Special District Act reinforce our selection of the substantial compliance standard as appropriate to this case. Section 32–1–830(1), C.R.S.1973 (1982 Supp.), expressly states that courts reviewing controversies arising out of special district elections shall decide the issues "with a view to obtaining substantial compliance" with the election provisions of the act. Also, section 32–1–824, C.R.S.1973 (1982 Supp.), requires special district boards, when canvassing the returns of an election, to count votes which do not strictly conform to the statute as long as "such returns are sufficiently explicit to enable such persons authorized to canvass votes and returns to determine therefrom how many votes were cast for the several candidates or on the questions submitted." Finally, the legislature included many measures, in addition to the absent voter affidavit, to curb fraud in special district elections.[10]

■ Considering the nature and purpose of absentee voting legislation as well as the specific legislative provisions relating to absentee voting in special district elections, we are satisfied that where, as here, there is neither claim nor showing of fraud, undue influence, or intentional wrongdoing, a district court resolving a special district election controversy must apply a standard of substantial compliance rather than strict compliance in determining the validity of absent voters' ballots.[11] Substantial compliance, in the context of this case, means that the absent voter has affixed his or her signature to the affidavit and has provided sufficient information in the affidavit to

10. Some of the measures designed to safeguard against fraud include the following: the requirement that an election judge in each precinct keep a poll book containing the names of electors voting (section 32–1–812(3)); the right of each candidate to appoint an election watcher in each election precinct (section 32–1–813(2)); specific provisions for challenges to voter qualification (section 32–1–822(2)); detailed procedures for the canvass of votes (section 32–1–823) and the recount of votes (section 32–1–826); and the right to petition the court for an expeditious review of an election challenge (section 32–1–830).

11. *Stegon v. Pueblo West Metropolitan District,* 198 Colo. 128, 130, 596 P.2d 1206, 1208

(1979), in which we stated that "the better rule is to require strict compliance when evaluating the notice of a special election within a district," is not contrary to our adoption of the substantial compliance rule in this case. In *Stegon,* we relied upon strict compliance in order to ensure that adequate notice of an election would be provided to special district electors. The instant case concerns the validity of individual ballots cast by absent voters in a contested election. The central focus in both *Stegon* and this case is the right to vote itself, and the rule applied in each situation is tailored to safeguard that right against unnecessary abridgement.

establish the elector's qualifications to vote in a special district election.

### III.

We turn now to the absentee ballots rejected by the district judge. The seven voters whose ballots were disqualified fit into four groups which we will consider separately.

### A.

█ The affidavits of David and Diane E. Doyle were incomplete in the following respects: first, although they did write the word "Eagle" in the taxable property category of voter qualification, they failed to mark one of the voter qualification boxes; next, they failed to write their address on the affidavit form; and, last, they failed to fill in the election date on the affidavit. These affidavits, in our view, meet the standard of substantial compliance.

The failure to place a cross mark in the box immediately preceding the appropriate voter qualification category was remedied by the Doyles' writing of the word "Eagle" in the voter qualification category peculiar to them and in no other category.[12] The Doyles' claim of qualification to vote on the basis of taxable property within the district was thus obvious from the affidavit itself.

The Doyles' failure to write their residence on the line immediately above their signature did not invalidate their ballots. The listing of an address is admittedly of critical significance when residency within an electoral district is an indispensable prerequisite to voting. In this case, however, residency was only one of three alternative categories of voter qualification, and nonresidency, by itself, was not a basis for disqualification.[13] Given the stipulated fact that the Doyles were qualified to vote in

the election, plus their writing of the county in which their taxable property was located within the district, and their sworn statement that they were qualified to vote at a general election in the state, we do not consider fatal to their ballot their failure to include their present place of residence on the affidavit.

Nor should the Doyles' ballots have been invalidated because of their failure to write in the date of the election on the affidavit. The text of the clause, "I have not previously voted at the election of the Directors held on _____, 19___," was phrased in the past tense but required the inclusion of a future date. This inconsistency might have engendered some confusion as to what date was to be written in the affidavit. Also, since the Doyles had applied for absentee ballots for this particular election, their acknowledged statement that "I have not previously voted at the election of the Directors" was an affirmation that they had not cast any other ballot in that particular election.

### B.

█ The next group of disqualified voters consists of April R. Nottingham, Brian L. Nottingham, and Duane Piper. Each of these voters placed an "X" mark in the box preceding the appropriate voter qualification category and completed the blank lines in that category,[14] but failed to fill in the blank lines for residence and election date immediately above their signature. These omissions are identical to two of the omissions which we considered in the case of the Doyle affidavits. Because these three voters were qualified to vote in the election, signed the affidavit and placed an appropriate mark in the voter qualification category applicable to them, and further attested

---

12. The voter qualification category selected by the Doyles read: "I (or my spouse) own taxable real or personal property within the _____ District, Eagle County, Colorado, or the area to be included in the district."

13. Although not critical to our decision, we note the trial court's observation that the residency blank was somewhat ambiguous. It could have been interpreted as referring to the

voter's residence in the district or, instead, the voter's permanent place of residence. *See* note 7, *supra*.

14. April R. Nottingham and Duane Piper designated taxable property as the basis of voter qualification, and Brian L. Nottingham the category of residency.

that they had not previously voted at the election, we conclude that these affidavits reach the standard of substantial compliance.

### C.

■ We next consider the affidavit of James J. Collins, who checked the residency box and filled in the blanks in the sentence which followed it, thereby affirming that he had been a resident of the "Avon Metro District, Eagle County, Colorado or the area to be included in the district for not less than thirty-two (32) days." Although Collins claimed residency as the basis of his right to vote, he wrote immediately above his signature that he resided at 777 Potato Patch Drive, an address which all agree was outside the district. Under these circumstances Collins' affidavit was patently contradictory as to his residency and therefore failed to meet the substantial compliance standard for absentee voting. Hence, the district court properly concluded that Collins' vote should not be counted in the tally.

### D.

■ The final nonconformity relates to the affidavit of Barbara Koch who, after writing her name on the first line of the affidavit and placing an appropriate mark in the taxable property category as the basis of her qualification to vote, failed to sign her affidavit. Section 32–1–821(4), C.R.S.1973 (1982 Supp.), requires that the affidavit of the absent voter be signed, and a signature, in our opinion, is the starting point for an inquiry under the substantial compliance standard of review. The signature line on the affidavit form was clearly designated with the words "Elector's Signature" at the very end of the voter's statement of qualification. Thus, there could be no confusion over the fact that the affidavit was to be signed by the voter in the place designated.[15] The name "Barbara Koch" in the first line of the affidavit merely established the identity of the affiant and nothing more. A "signature," in contrast, is not only a mark of identity but also a sworn affirmation or adoption of the contents of the affidavit itself. Without the signature, there is in reality no affidavit.

### IV.

■ In summary, we conclude that the district court properly rejected two of the

---

**15.** The location of the signature line in the affidavit distinguishes this case from the situation described in *Lanser v. Koconis,* 62 Wis.2d 86, 214 N.W.2d 425 (1974), where the court was faced with a rather chaotic affidavit form described as follows:

"Each challenged absentee ballot envelope has on the back a form which in part reads, 'I, _____ (certify) (do solemnly swear) ....' with another space for the absentee voter's signature at the bottom and on the right-hand side of this certification paragraph and immediately above the statement to be executed by a notary public or officer authorized to administer oaths. The voters who completed these challenged certifications did not sign their names at the bottom of this paragraph where the space is provided for their signature but, instead, put their names in the space at the beginning of the paragraph. Below, and to the right of the voter's certification paragraph, is the affidavit form which can be completed by a notary public or officer authorized to administer oaths, in lieu of having two witnesses certify the absentee voter's signature. The officer's affidavit form was not used by these voters." 62 Wis.2d at 95, 214 N.W.2d at 429.

In holding that the signing of the affidavit at the beginning rather than at the end constituted substantial compliance, the court stated:

"[W]e are of the opinion that one reason for the confusion on the part of these voters regarding the proper placement of their signature, stems from the fact that the voter certification paragraph and the officer's affidavit form are so located on the envelope that one could reasonably have concluded that the signature space between the two was part of the officer's affidavit and not for the certification of the voter's signature before two witnesses. Our conclusion is buttressed by the fact that those envelopes, which were subscribed to before an officer who completed the affidavit, had voter certifications signed in the proper place. To further add to the confusion, the instructions on the end of the envelope state, 'Only one certificate need be signed—NOT BOTH.' ·

"In each instance the voter signed his name, although not in the specific place designated, and the signature was witnessed by two witnesses." 62 Wis.2d at 95–96, 214 N.W.2d at 429–30.

seven challenged absentee ballots but erred in rejecting five other ballots. We are unable to determine on the basis of the record before us what effect, if any, the five incorrectly invalidated ballots had on the outcome of the election, and, therefore, we leave that matter for resolution by the district court in the course of further proceedings. We accordingly remand the case to the district court with directions to resolve the election controversy pursuant to its statutory authority under section 32–1–830, C.R.S.1973 (1982 Supp.), and in a manner consistent with the views expressed herein.