**G. Lowell MORAN and Karolyn Moran, Contestors–Appellants,**

v.

**Robert L. CARLSTROM, Contestee–Appellee.**

No. 89SA7.

Supreme Court of Colorado, En Banc.

June 19, 1989.

Holland & Hart, John S. Castellano, Denver, for contestors-appellants.

Wood, Herzog, Osborn & Bloom, P.C., David L. Wood, Fort Collins, for contestee-appellee.

VOLLACK, Justice.

G. Lowell Moran and Karolyn Moran (the Morans) appeal the judgment of the Jackson County District Court declaring Robert L. Carlstrom the winner of the Jackson County District 3 county commissioner election. At issue is the validity of four ballots cast in the November 8, 1988 general election. The district court held that the four ballots were "defective" within the meaning of section 1–7–309, 1B C.R.S. (1980), because the voter in each case had marked in ink more names than there were persons to be elected to an office. We affirm.

## I.

Two county commissioner positions were to be filled in the November 8, 1988 Jackson County general election. Names of candidates for the District 2 and District 3 county commissioner positions appeared on the same paper ballot.[1] Although candidates for a county commissioner position are required by statute to reside in the

---

1. In addition to the names of candidates for county commissioner for Districts 2 and 3, the 1988 paper ballot listed the names of candidates for the following elections: President and Vice President of the United States; Representative to the 101st United States Congress from the 3rd Congressional District; at large member of the State Board of Education; at large Regent of the University of Colorado; Regent of the University of Colorado from the 3rd Congressional District; state senator; state representative; District Attorney for Judicial District 8; and County Surveyor. The ballot also contained judicial questions concerning the retention of five judges and eight proposed state constitutional amendments.

district they seek to represent,[2] county voters from all three districts may vote to fill any county commissioner position.

The Jackson County general election ballot listed one name for the District 2 county commissioner position: Robert E. Manville, the incumbent office holder and winner of the Republican primary election. The ballot listed two names for the District 3 county commissioner position: Robert L. Carlstrom, the incumbent office holder and winner of the Republican primary election; and G. Lowell Moran, an independent candidate who successfully petitioned to place his name on the ballot. The ballot contained blanks for write-in candidates for each office.

Robert E. Manville was not the only person seeking the District 2 county commissioner position. Dennis V. Brinker, a registered Republican, filed an affidavit of intent for the District 2 county commissioner position. Brinker resides in Precinct 3, which is located in Jackson County District 2. By filing an affidavit of intent and by residing in District 2, Brinker was eligible to accumulate votes as a write-in candidate for the District 2 county commissioner position.

Write-in candidate Brinker won the District 2 county commissioner election by a vote of 455 to 366. The District 3 county commissioner election, however, was a close race between Carlstrom and Moran. When the polls closed, Carlstrom received 434 uncontested votes for the District 3 county commissioner position, while Moran received 429 uncontested votes.

Four ballots in the District 3 county commissioner election were contested.[3] Three ballots showed no name checked off in the District 2 race. The three ballots, however, showed two names checked off in the District 3 race: Moran's, which was

checked off with an "X," and Brinker's, which was written in and checked off with an "X." A reproduction of one of the three ballots appears below:

One ballot showed Brinker's name written in and checked off for both the District 2 position and the District 3 position, in addition to checking off Moran's name for the District 3 position. A reproduction of this ballot appears below:

Each ballot displayed the phrase "Vote for not more than One" above the listing of candidates for each office.

Because of the closeness of the vote, a recount was conducted by a three-person board of canvassers.[4] The board of can-

2. That candidates must reside in the district they seek to represent is implied in section 30–10–306, 12A C.R.S. (1986), which states that the office of a commissioner becomes vacant if he or she "moves from the district in which they resided when elected."

3. In their statements contesting the election, the Morans argued that five ballots were erroneous-

ly rejected. They argued before the district court, however, that four ballots were erroneously rejected. No explanation for this discrepancy appears in the record.

4. Recounts must be held in any general county election in which the margin of victory is one percent or less of the total vote. § 1–11–102(1), 1B C.R.S. (1980). The original margin of victo-

vassers rejected the four contested ballots because each ballot violated section 1–7–309 by containing more names than persons to be elected to the District 3 county commissioner office. The board of canvassers also rejected two ballots for Carlstrom and counted one ballot for Moran that had been rejected.[5] As a result, Carlstrom was declared the winner of the District 3 county commissioner election by a two-vote margin of 432 to 430.

In separate complaints against Carlstrom filed in the Jackson County District Court, the Morans contested the District 3 county commissioner election by challenging the decision of the board of canvassers to reject the four ballots. The complaints were consolidated for trial. Carlstrom filed a motion *in limine* to prevent the Morans from introducing evidence that voters were confused about the district in which write-in candidate Brinker resided and that the election judges refused to provide information to voters to resolve this confusion. The district court granted the motion *in limine.*

The district court on December 21, 1988, determined that the board of canvassers had properly rejected the four ballots for being double marked in violation of section 1–7–309.

The Morans appealed the judgment of the district court to this court pursuant to section 1–11–211(2), 1B C.R.S. (1980).

## II.

The General Assembly enacted what is now section 1–7–309 in 1891. Sec. 29, § 1625c1, 1891 Colo.Sess.Laws 160. It states that a ballot may not be counted "[i]f a voter marks in ink or indelible pencil more names than there are persons to be elected to an office or if for any reason it is impossible to determine the choice of any voter for any office to be filled." The statute was repealed and reenacted in 1980

and remains a part of the general election law. The four contested ballots each show two names checked off for the District 3 county commissioner position. Under section 1–7–309, these ballots are defective and may not be counted.

The Morans argue that the four ballots were not defective within the meaning of section 1–7–309 and should not have been rejected. They argue that the four attempts to write Brinker in for the District 3 position could not have resulted in votes for Brinker because he was not seeking the District 3 position and because section 1–4–1001, 1B C.R.S. (1980 & 1988 Supp.), prohibits the tabulation of a write-in vote for a person who has not filed an affidavit indicating that the person desires the office.[6] Because the write-in votes for Brinker could not count for Brinker for tabulation purposes of section 1–4–1001, the Morans contend, the write-in votes for Brinker should not count against Moran for double marking purposes under section 1–7–309. As a result, they argue, the contested ballots should be read as four votes for Moran and he should be declared the winner of the District 3 county commissioner election by a vote of 434 to 432. While we agree that the four contested ballots cannot be counted for Brinker in the District 3 race, we conclude that the four contested ballots cannot be counted for Moran under section 1–7–309.

### A.

The right to vote is a fundamental right. *Erickson v. Blair,* 670 P.2d 749, 754 (Colo.1983). The General Assembly, however, may place reasonable restrictions upon the right to vote. *Littlejohn v. People ex rel. Desch,* 52 Colo. 217, 223, 121 P. 159, 162 (1912); *Nicholls v. Barrick,* 27 Colo. 432, 441, 62 P. 202, 205 (1900). One such restriction is that the voter may not mark more names on a ballot than there

---

ry was five out of 863 votes, which is less than one percent of the total vote.

**5.** These ballots are not at issue.

**6.** Section 1–4–1001 provides in part:

**Write-in candidate affidavit.** No write-in vote for any office in a ... general election shall be counted unless an affidavit of intent has been filed indicating that the person desires the office and is qualified to assume the duties of that office if elected.

are persons to be elected to an office. § 1–7–309. Such a restriction furthers the legitimate state interests of preventing voter fraud and confusion and of securing a fair and uniform vote. *See Nicholls*, 27 Colo. at 441, 62 P. at 205; *Young v. Simpson*, 21 Colo. 460, 462, 42 P. 666, 667 (1895); *see also* J. Wigmore, *Australian Ballot System* 193 (2d ed. 1889).

■ The authority of the General Assembly to place reasonable restrictions on the right to vote, however, is itself subject to limitation. The General Assembly may not enact voting restrictions which deny the franchise to the voter or render its exercise so difficult and inconvenient as to amount to a denial of the right to vote. *Littlejohn*, 52 Colo. at 223, 121 P. at 162. Nor may the General Assembly condition a voter's exercise of the franchise upon compliance with "a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters." *Erickson*, 670 P.2d at 754.

■ Accordingly, a ballot cast by a qualified elector should be rejected only if the elector's intent cannot be ascertained with reasonable certainty. *Baldwin v. Wade*, 50 Colo. 109, 112, 114 P. 399, 400 (1911); *see also Nicholls*, 27 Colo. at 441, 62 P. at 205 (statutes tending to limit a voter's exercise "should be liberally construed in his favor"); *cf.* § 1–1–103(1), 1B C.R.S. (1986) (election code must be "liberally construed" so that all legally qualified electors may be permitted to vote).

### B.

Three cases from the late nineteenth and early twentieth centuries figure in our analysis and merit a full recitation of facts. First is *Young v. Simpson*, 21 Colo. 460, 42 P. 666 (1895). *Young* concerned the 1894 Logan County county commissioner's election. The canvassing board found that Nathaniel Young, a People's party candidate, received 477 votes, while John Simpson received 476 votes. Simpson contested the election. Following the rejection of some ballots and the inclusion of others, the county court declared Simpson the winner

of the election by a margin of 477 to 476 over Young. Young appealed to this court, arguing that two ballots for him were erroneously rejected by the county court.

This court held that one ballot for Young was properly rejected and one ballot should have counted for Young. As a result, Young's total vote was raised from 476 to 477, and a tie was declared between Young and Simpson. The ballot that was properly rejected showed an "X" in the box opposite the emblem of the People's party as well as an "X" in the box opposite the name of each member of the People's party except Young's. Under voting laws in force at the time, an elector could cast a vote for all members of a political party simply by marking an "X" in the box opposite the party emblem on the ballot. Alternately, the elector could cast a vote for candidates individually without regard to party affiliation by marking an "X" in the box opposite the name of each candidate. This court stated that "the particular designation of candidates" that did not include Young "must be held to control the general designation" of the People's party that did include Young. 21 Colo. at 463, 42 P. at 667.

The second case is *Heiskell v. Landrum*, 23 Colo. 65, 46 P. 120 (1896), decided one year after *Young*. *Heiskell* concerned a three-way race for the Morgan County clerk and recorder's office between Tyler Heiskell, a Democrat, Thomas Landrum, a member of the People's party, and one Richardson, a Republican. The board of canvassers and the district court declared Landrum the plurality winner over Heiskell by a margin of two votes. Heiskell appealed to this court, arguing that six ballots that had been rejected by the board of canvassers and the district court should have been counted for him. The six ballots showed an "X" in the box opposite the Republican party emblem as well as an "X" in the box opposite Democratic candidate Heiskell's name. Heiskell relied on *Young* in arguing that the particular designation of Democratic candidate Heiskell must be held to control the general designation of the Republican party, with the result that Heiskell should receive the six contested

votes and be declared the winner of the election.

In affirming the judgment of the district court, this court held that the six ballots were defective under what is now section 1–7–309 because the elector on each ballot marked more names than there were persons to be elected for the office. We declined to hold that the particular designation of Democratic candidate Heiskell controlled the general designation of the Republican party emblem. Instead, we concluded that the general designation of the Republican party represented a vote for Richardson, while the particular designation of Heiskell represented a vote for Heiskell. As such, each ballot showed two votes for one office, rendering that part of the ballot defective under the precursor to section 1–7–309. 23 Colo. at 68, 46 P. at 121.

The third case is *Baldwin v. Wade*, 50 Colo. 109, 114 P. 399 (1911). *Baldwin* concerned the Granada mayoral election between C.D. Baldwin, the Citizen's party candidate whose name appeared on the ballot, and C.B. Wade, a write-in candidate. The board of canvassers determined that Baldwin was the winner by a vote of 65 to 63. Wade contested the election, arguing that three ballots were erroneously rejected by the board of canvassers. On one ballot, the voter wrote in Wade's name in the box containing Baldwin's printed name rather than in the box beneath Baldwin's name for write-in candidates. That ballot also showed an "X" in the box opposite Baldwin's name rather than in the box opposite the box for a write-in candidate's name. Two other ballots were rejected for reasons not pertinent to this discussion. The Prowers County District Court held that all three ballots were erroneously rejected and declared Wade the winner by a vote of 66 to 65.

This court affirmed the district court and counted all three ballots for Wade. We

concluded that the ballot showing Wade's name written into the box containing Baldwin's printed name "plainly shows" the elector's intent to vote for Wade because there could be no other explanation for writing Wade's name in the box assigned to Baldwin. 50 Colo. at 113, 114 P. at 400–01.

### C.

The Morans advance three arguments that the four contested ballots are not defective within the meaning of section 1–7–309. The first is a legislative history argument that section 1–7–309 was never intended to require rejection of a double marked ballot containing the name of an eligible candidate as well as the name of an ineligible candidate. The second is a statutory interpretation argument that section 1–4–1001, being a statute of specific applicability, controls over section 1–7–309, a general statute. The third is a case law argument that the precedent most closely resembling the facts in this case upholds the validity of the four contested ballots. We reject all three arguments.

### 1. *Legislative History Argument*

The legislative history of section 1–7–309 does not support the Morans' contention that section 1–7–309 prohibits only the marking of more names than there are eligible persons to be elected to an office. As the Morans correctly note, voting in Colorado in 1891 excluded write-in candidacy and permitted voting solely for candidates whose names appeared on the ballot.[7] Write-in voting finally became legal in Colorado in 1894 with the amendment of the general election laws of 1891. Ch. 7, sec. 2, § 18, 1894 Colo.Sess.Laws 59, 62. Candidates in 1891 appeared on the ballot only if they were willing and eligible to be elected to the office in question.

That write-in voting was not possible until 1894, however, in no way supports the

---

7. Candidates in 1891 became eligible to have their names appear on the ballot only by being nominated and by accepting the nomination. Mills Stat.Ann. § 1625n (1891). A candidate was nominated by obtaining the majority vote of delegates to the convention of a political party that polled at least 10% of the vote in the previous general election of the political division in question, Mills Stat.Ann. § 1625c (1891), or by obtaining the signatures of a given number of voters residing in the political division in question, Mills Stat.Ann. § 1625f (1891).

Morans' contention that section 1–7–309 was intended to apply only to two or more votes for eligible persons. First, the General Assembly in 1894 amended the 1891 general election laws to permit write-in voting yet did not amend what is now section 1–7–309 to prohibit only the double marking of *eligible* candidates. The General Assembly has repeatedly repealed and re-enacted the defective ballot law without significant change. We interpret this near century of legislative silence as a refusal to narrow the reach of section 1–7–309 to eligible candidates.

Second, the Morans misperceive the purpose section 1–7–309 was designed to serve. Section 1–7–309 was designed to ensure an accurate and honest vote by eliminating those ballots which do not clearly demonstrate the voter's choice of a particular candidate because of a vote for more persons than available offices. Voting for two or more persons for one office gives no indication as to which person the elector desires to hold the office, and as such, is "defective." In this way, section 1–7–309 is consistent with "the cardinal principle controlling the count" of enforcing the "intention of the voter as expressed upon the face of his ballot." *Nicholls*, 27 Colo. at 442, 62 P. at 205.

Whereas section 1–7–309 seeks to effectuate the elector's intent where possible by rejecting a ballot only where the checking off of more than one name obscures that intent, section 1–4–1001 seeks to defeat the elector's intent by rejecting a clearly expressed choice for a person who did not file an affidavit of intent for the office in question. Even though section 1–4–1001 prohibits these ballots from counting for Brinker, the four electors may well have intended that result when they wrote in and checked off Brinker's name for the District 3 race. The four electors may just as well have intended their ballots to count for Moran when they checked off his name for the District 3 race. Counting those ballots for either candidate does not ensure an accurate and honest count, even though the ballots could not count for Brinker because of section 1–4–1001. The purpose of

section 1–7–309 is therefore fulfilled only if these four ballots are rejected.

### 2. *Statutory Interpretation Argument*

■ The Morans argue that section 1–7–309, relating to voting in general, and section 1–4–1001, relating to write-in voting, are general and specific statutes on the same subject. To the extent these two statutes conflict, they argue, section 1–4–1001 must control. The only logical way for section 1–4–1001 to control, they claim, would be to disregard the name of write-in candidate Brinker and to treat the four contested ballots as votes for Moran.

The Morans' statutory interpretation argument is unpersuasive. It is true that where specific and general statutes on the same subject conflict, the provisions of the specific statute prevail. *State v. Dayhoff*, 199 Colo. 363, 365, 609 P.2d 119, 121 (1980). The Morans' argument, however, assumes that section 1–4–1001 and section 1–7–309 deal with the same subject. They do not. Section 1–4–1001 regulates the conduct of write-in candidates. It is designed to promote the orderly registration of write-in candidates by prohibiting the write-in candidate who fails to file a timely affidavit of intent from accumulating votes.[8] It is also designed to shield a noncandidate from the legal duty of representing an electorate he had no desire to serve. Section 1–7–309, by contrast, regulates the conduct of voters. It is designed to promote an accurate and honest vote and to effectuate where possible the intent of the electorate by rejecting only those ballots showing more names than persons to be elected to an office. Because the two statutes are designed for different purposes, they do not treat the same subject.

In addition, the two statutes do not conflict. As an example of the typical situation in which the specific statute controls over a conflicting general statute on the same subject, one statute may prescribe a six-year limitations period during which a general tort claim may be brought, while another statute may prescribe a three-year limitations period during which a product

---

**8.** Section 1–4–1001 not only requires write-in candidates to file an affidavit of intent but also prescribes the place and time the affidavit must be filed.

liability claim may be brought. A product liability claim that accrued five years before it was filed would be barred under the more specific statute but not barred under the general statute. It would not be possible to give effect to both statutes. Those two statutes therefore conflict and, under familiar principles of statutory interpretation, the three-year limitations period would apply to bar the claim. *See Persichini v. Brad Ragan, Inc.*, 735 P.2d 168, 172–73 (Colo.1987).

In this case, however, it is possible to give effect to both section 1–4–1001 and section 1–7–309. The four contested ballots cannot count for Brinker in the District 3 race either under section 1–4–1001 or under section 1–7–309. They cannot count for Brinker under section 1–4–1001 because he did not file an affidavit of intent for the District 3 race. They cannot count for Brinker under section 1–7–309 because the electors marked on each ballot two names for the District 3 race. By contrast, .although section 1–4–1001 says nothing about whether the four ballots which cannot be counted for Brinker may be counted for Moran, section 1–7–309 makes clear that ballots showing two names for one office are defective and may not be counted. Because it is possible to give effect to both statutes, they do not conflict.

### 3. *Case Law Argument*

■ Case law supports our decision to reject the four contested ballots. The reasoning of *Baldwin, Heiskell,* and *Young* demonstrates that a ballot must be liberally construed so as to be counted where the elector's intent can be discerned. *See Baldwin,* 50 Colo. at 113, 114 P. at 400–01; *Heiskell,* 23 Colo. at 68, 46 P. at 121; *Young,* 21 Colo. at 462, 42 P. at 667. This principle retains its vitality today. *Cf. Erickson v. Blair,* 670 P.2d at 754–55 (rejecting rule of strict compliance in absentee voting cases in favor of substantial compliance standard). Where the elector's intention cannot be discerned, however, the elector's right to have the ballot count must give way to the right of the electorate to a fair and accurate count.

We find the facts in this case to resemble more closely the facts in *Heiskell* than the facts in *Young* or *Baldwin.* As in *Heiskell,* the voters in this case marked two places on the ballot indicating a choice of two candidates for one office, and it was not possible to ascertain the voter's preference for one candidate. Unlike *Baldwin,* the ballots in this case do not demonstrate a preference for Moran.

### III.

■ We conclude that the four contested ballots were properly rejected under section 1–7–309 because in each case the voter's intent cannot be ascertained with reasonable certainty. We also recognize that the prohibition under section 1–7–309 against choosing more than one person for one office is itself a reasonable restriction on the right to vote. It does not require the exercise of a bewildering degree of precision on the part of the electorate. Each ballot clearly stated that the elector was to vote for not more than one person for the District 3 county commissioner position. A commonsense reading of the statute shows these four ballots are defective within the meaning of section 1–7–309.

The judgment of the district court is affirmed.

ERICKSON, J., dissents.

ERICKSON, Justice, dissenting.

I respectfully dissent. Brinker was ineligible to run for District 3 County Commissioner and for that reason, the four ballots should not have been rejected. Section 1–4–1001, 1B C.R.S. (1980 & 1988 Supp.), provides that no write-in vote "shall be counted unless an affidavit of intent has been filed indicating that the person desires the office and is qualified to assume the duties of that office if elected." Section 1–6–402(7), 1B C.R.S. (1980), permits the voter to write in the name of any *"eligible person* not printed on the ballot *who has filed an affidavit of intent* of write-in candidate for whom he desires to vote as a candidate for such office." (Emphasis added.) Write-in votes are therefore void *unless* the write-in candidate has previously filed an affidavit of intent.

It is undisputed that Brinker filed an affidavit stating that he intended to run for

District 2 County Commissioner. He did not file an affidavit indicating his intentions to run for District 3 County Commissioner and accordingly, was never a qualified candidate for District 3. The write-in votes reflected on the four contested ballots for Brinker as District 3 County Commissioner are precluded from being counted in that district and should be excluded from each ballot. In my view, the four ballots should not be invalidated because of the write-in votes for Brinker. The write-in votes do not abrogate the voter's intent to elect G. Lowell Moran. If the four Brinker votes are excluded from the contested ballots, each of the four ballots carries one valid vote for Moran as District 3 County Commissioner.

The four contested ballots are not "defective ballots," as defined in section 1–7–309, 1B C.R.S. (1980), and I would conclude that they may be counted which would cause Moran to be elected as county commissioner. Accordingly, I dissent.