2014 CO 4

In re: **Maurice C. JONES, an individual and Citizen Center, a Colorado non-profit corporation, Plaintiffs,**

v.

**Christian R. SAMORA, in his official capacity as Clerk & Treasurer of the Town of Center, Colorado; Town of Center Colorado, a Colorado statutory town; Herman Dickey Sisneros, an individual; Edward W. Garcia, an individual; and Geraldine Martinez, an individual, Defendants.**

**Supreme Court Case No. 13SA148**

Supreme Court of Colorado.

January 27, 2014

As Modified on Denial of Rehearing February 24, 2014

Attorneys for Plaintiffs: McGuire Baines, LLC, Robert A. McGuire, Jeffrey D. Baines, Denver, Colorado

Attorneys for Defendants Herman Dickey Sisneros, Edward W. Garcia and Geraldine Martinez: Senter, Goldfarb & Rice, LLC, Eric M. Ziporin, Jennifer F. Kemp, Denver, Colorado

Attorneys for Defendant Christian R. Samora: Overturf McGrath Hull & Doherty, P.C., Peter H. Doherty, Meredith L. McDonald, Denver, Colorado

Attorneys for Defendant Town of Center, Colorado: Nathan, Bremer, Dumm & Myers, P.C., J. Andrew Nathan, Marni Nathan Kloster, Denver, Colorado, Garfield & Hecht, P.C., David H. McConaughy, Christopher D. Bryan, Glenwood Springs, Colorado

Attorneys for Amicus Curiae Colorado Secretary of State: John W. Suthers, Attorney General, Leeann Morrill, First Assistant Attorney General, Denver, Colorado

Attorneys for Amici Curiae Jennie Sanchez and Mary McClure: Lewis Roca Rothgerber LLP, Alex C. Meyers, Denver, Colorado, Shelley Wittevrongel, Attorney at Law, P.C., Shelley Wittevrongel, Boulder, Colorado

Attorneys for Amicus Curiae Colorado Lawyers Committee: Davis Graham & Stubbs, LLP, Geoffrey C. Klingsporn, Denver, Colorado

Attorney for Amicus Curiae Colorado Common Cause: David J. Janik, Denver, Colorado

Attorneys for Amicus Curiae Vet Voice Foundation: Azizpour Donnelly, LLC, Katayoun Azizpour Donnelly, Denver, Colorado

Attorneys for Amici Curiae Eagle County, CO, Boulder County, CO, Larimer County, CO, Jefferson County, CO, and Chaffee County, CO Clerks and Recorders: Hall & Evans, L.L.C., Thomas J. Lyons, Gillian Dale, Denver, Colorado

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 This case concerns a contested March 19, 2013, recall election in the Town of Center, Colorado. Herman D. Sisneros, Edward W. Garcia, and Geraldine Martinez were elected to replace three recalled municipal officers: Mayor Susan M. Banning, Trustee John Faron, and Trustee Maurice C. Jones, respectively. Following a recount, Maurice C. Jones and Citizen Center, a Colorado nonprofit corporation (collectively, "Jones"), filed an election contest under section 31–10–1301, *et seq.*, C.R.S. (2013) seeking to set aside the results of the recall election on several grounds, including that voters' right to ballot secrecy had been violated. The District Court for Saguache County entered judgment on June 7, 2013, setting aside the results of the recall election, ordering a new recall election, and continuing in office the three municipal officials who had been re-

called. Town Clerk Christian R. Samora, Sisneros, Garcia, and Martinez (collectively, "Samora") petitioned us for review under section 31–10–1305, C.R.S. (2013), and we accepted jurisdiction over this election matter.[1]

¶ 2 We hold that the district court erred as a matter of law in setting aside the results of the recall election and ordering a new recall election. Accordingly, we reverse the district court's judgment and return this case to the district court with directions to enter a judgment under section 31–10–1307, C.R.S. (2013) that Herman D. Sisneros, Edward W. Garcia, and Geraldine Martinez were duly elected.

## I.

¶ 3 The Town of Center is a statutory municipality of the State of Colorado located in Rio Grande and Saguache Counties. During the summer of 2012, the Town Board proposed an ordinance authorizing $2.8 million in revenue bonds to pay for improvements to the Town's water system. The bonds were to be repaid by Town residents through a series of utility fee increases. Concerned about the Town Board proceeding with this plan without submitting it to a public vote, a group of Town citizens formed a recall committee and circulated petitions seeking to recall the Town's Mayor and several Town Trustees. Leading up to the recall election, there were disputes regarding the referendum process and the content of the ballots to be used. Many of the potential voters and candidates also knew each other personally and, during the election, there were only several hundred voters in total, a majority of whom voted via absentee ballots.

¶ 4 The election was conducted on March 19, 2013, pursuant to the Colorado Municipal Election Code of 1965, sections 31–10–101, *et seq.*, C.R.S. (2013) and other state statutes governing the recall of municipal officers. *See* §§ 31–4–501, *et seq.*, C.R.S. (2013). Four election judges, including Adeline Sanchez, who had herself been instrumental in the recall effort, assisted Town Clerk and Designated Election Official Christian Samora in counting the votes and certifying the results of the election after the polls closed at 7:00 p.m. that evening. The election judges' actions while counting the ballots gave rise to the election contest, trial court judgment, and appeal in this case.

¶ 5 Before assisting with the election, Samora and the other election judges took the oath specified by section 31–10–407(1), C.R.S. (2013), which required them to affirm that

---

1. This appeal lists the following issues:

    1. Did the District Court err in determining that the March 19, 2013 Recall Election should be set aside and ordering a new recall election because the election judges counted absentee (mail-in) ballots on which the stubs containing ballot numbers remained, notwithstanding that the stubs were removed by the election judges when they realized that the stubs had remained on the ballots?

    2. In support of its decision to set aside the Recall Election and to order a new recall election, did the District Court err in determining that there was a potential for the secrecy of ballots to be compromised when the ballots were counted with the numbered stubs remaining on them, notwithstanding the undisputed evidence that the secrecy of ballots was not violated because no one did determine, and no one could have determined, how any particular voter had voted?

    3. In setting aside the Recall Election and ordering a new recall election, did the District Court err in relying on the case *Taylor v. Pile,* 154 Colo. 516, 391 P.2d 670 (Colo.

1964), inasmuch as that decision was issued before the Colorado Municipal Election Code of 1965 was enacted, which adopted specific statutory procedures for municipal elections for statutory towns such as the Town of Center?

    4. Did the District Court err in reinstating the three recalled Town Board members and ordering a new recall election when the remedy under the Election Contest statutes, § 31–10–1307, C.R.S., does not give authority to the District Court to reinstate recalled board members or order a new recall election?

    5. In setting aside the Recall Election results and ordering a new recall election because election judges counted absentee ballots before removing the numbered stubs, did the District Court err in not applying the "substantial compliance" test of *Erickson v. Blair,* 670 P.2d 749 (Colo.1983) and related cases?

When we accepted jurisdiction over this appeal, we left in place that portion of the District Court's order that continued the recalled Town officials in office pending our resolution of this appeal.

they would not try to ascertain or disclose how any voter voted.[2] While the polls were open, the election judges required in-person voters to complete a form confirming that they were registered voters of the Town of Center. The judges then checked the Town's voter registration lists to confirm that each person's name properly appeared on the lists. *See* § 31–10–606(1), C.R.S. (2013) (requiring election judges to follow this procedure); *see also* § 31–10–607, C.R.S. (2013) (requiring that, once in-person voters complete their ballots, they return them to an election judge so the judge can remove the identifying numbered stubs from the ballots—in view of the voters—before the voters place the ballots in the ballot box).

¶ 6 Prior to the mailing of absentee ballots, the names and ballot stub numbers of voters requesting absentee ballots were recorded on the voter registration lists, as required by section 31–10–1002(3), C.R.S. (2013). Only persons whose names appeared on the voter registration lists who had not previously voted by absentee ballot were permitted to vote in person on March 19, 2013. Section 31–10–1007(1), C.R.S. (2013) requires absentee ballots to be cast and counted identically to the way in-person ballots are cast and counted, "except that one of the judges shall deposit the ballot in the ballot box without unfolding it."

¶ 7 When the polls closed, Samora and the other election judges proceeded to count the ballots in four stages: first, the judges counted the "yes" and "no" absentee ballots on the question of whether the municipal officers should be recalled; second, the judges counted the "yes" and "no" in-person ballots on the recall question. After counting a sufficient number of votes to recall three of the four municipal officials eligible for recall, the judges then counted the votes for the candidates for the three vacant offices, once again counting the absentee ballots first, followed by the in-person ballots.

¶ 8 A list of the absentee ballot stub numbers had been placed in a box across the room from where the election judges performed the vote count. That list recited absentee voter names and addresses paired with the ballot stub number of each voter's absentee ballot. Sometime during the first stage of ballot counting, as the judges were counting the "yes" and "no" votes on the absentee ballots, they noticed they had inadvertently left the numbered stubs attached to the absentee ballots rather than detaching the stubs prior to counting. Instead of stopping the count to remove the numbered stubs, the election judges proceeded with counting the "yes" and "no" responses on both the absentee and in-person ballots, and then removed the numbered stubs from the absentee ballots before moving on to the final stages of counting the votes.

¶ 9 After counting all of the ballots, the election judges completed election returns showing that Banning, Faron, and Jones were each recalled from office, and Sisneros, Garcia, and Martinez had been elected, respectively, to replace them. The results showed that Julio Paez, also proposed to be recalled, was retained in office as a Trustee. Jones then requested a recount and the recount was completed on March 29, 2013. On that date, Samora certified the election results as follows:

- Banning was recalled as Mayor by a margin of 33 votes, and Sisneros was elected to replace her as Mayor with 275 votes;

- Faron was recalled as Trustee by a margin of 43 votes, and Garcia was elected to replace him as Trustee with 152 votes;

- Jones was recalled as Trustee by a margin of 34 votes, and Martinez was elected

---

2. The full text of the oath reads:

I, [name], do solemnly swear (or affirm) that I am a citizen of the United States and the state of Colorado; that I am a registered elector in Colorado; that I will perform the duties of judge according to law and the best of my ability; that I will studiously endeavor to prevent fraud, deceit, and abuse in conducting the same; that I will not try to ascertain how any elector voted, nor will I disclose how any elector voted if, in the discharge of my duties as judge, such knowledge shall come to me, unless called upon to disclose the same before some court; and that I will not disclose the result of the votes until the polls have closed.

to replace him as Trustee with 150 votes; and

- Paez was retained as Trustee by a margin of 9 votes.

¶ 10 Jones and Citizen Center, a Colorado nonprofit corporation, filed an election contest and complaint pursuant to sections 31–10–1301, *et seq.*, in the District Court for Saguache County. The election contest alleged numerous defects with the election, including that illegal votes were counted, that errors and mistakes were made by election judges, that there was misconduct by the Town Clerk, and that various municipal entities exercised undue influence over voters in the Town. Jones and Citizen Center's primary complaint was that the numbered stubs were left on the absentee ballots during the initial stages of counting and this violated voters' right to cast secret ballots, rendering the election void.

¶ 11 Following a trial, the district court entered its judgment on June 7, 2013, making forty-eight separate findings of fact. *See* Judgment and Order, *Jones v. Samora,* 2013CV30009 (Colo. Dist. Ct. June 7, 2013) [hereinafter "Judgment"]. It determined that the election was fundamentally untainted by any substantive procedural error, was free of any fraud or intentional violation of voter secrecy, and, though there was an opportunity to draw a comparison between the absentee ballot stub numbers and the voter list during the counting process because the voter list was in a box across the room, no one actually took this opportunity to violate voter secrecy:

- "The preponderance of the evidence at trial establishes that no election judges or watchers accessed voter lists during the counting of the ballots, none knew which ballot numbers were assigned to which voter during the counting process and no photographs or videos were taken of the ballots." Judgment ¶ 19(b).
- "[Several election judges'] testimony taken together establish by a preponderance of the credible evidence that this was an *election which was fundamentally untainted by any substantive intentional error of procedure, free of any fraud or intentional violation of voting*

*secrecy.*" Judgment ¶ 22 (emphasis added).

- "There is no credible evidence to find that any improper use of the lists occurred. *The preponderance of the evidence fails to establish that any comparison of the [voter] lists to the absentee ballots with the stubs still affixed [sic] occurred at any time in the counting process. However, the testimony does establish there was opportunity to draw comparison during the counting with the previously observed list.*" Judgment ¶¶ 26–27 (emphasis added).
- "The Court is satisfied that counting of absentee ballots occurred with stubs affixed [sic] but, that this was not intentional nor is there any evidence that anyone, including the election judges, took this opportunity to in fact violate the secrecy of the ballot." Judgment ¶ 35.

¶ 12 Accordingly, even though the district court determined that the fundamental integrity of the recall election had not been compromised, it determined that the secrecy guarantee of Article VII, Section 8 had been violated when the election officials left the identifying numbered stubs on the absentee ballots while counting the recall question on those ballots. The district court proceeded to conclude as a matter of law that our decision in *Taylor v. Pile,* 154 Colo. 516, 391 P.2d 670 (Colo.1964) required it to void the election. It therefore declared the March 19, 2013, recall election void and ordered the Town to conduct a new recall election within thirty-to-ninety days. The district court further ordered that the pre-existing Town Mayor and Trustees remain in office pending the new election. Samora, the Town, Sisneros, Garcia, and Martinez petitioned us to review the district court's judgment, and we accepted jurisdiction over this election matter.

## II.

¶ 13 We hold that the district court erred as a matter of law in setting aside the results

of the recall election and ordering a new election.

### A. Standard of Review

¶ 14 In reviewing a district court's order, we defer to the district court's findings of fact if they are supported by the record, but review its conclusions of law, including questions of constitutional interpretation, de novo. *In re B.J.*, 242 P.3d 1128, 1132 (Colo.2010); *City of Golden v. Parker*, 138 P.3d 285, 289 (Colo.2006).

### B. Applicable Law and District Court Findings

¶ 15 The first paragraph of Article VII, Section 8 of the Colorado Constitution provides:

All elections by the people shall be by ballot, and *in case paper ballots are required to be used, no ballots shall be marked in any way whereby the ballot can be identified as the ballot of the person casting it.* The election officers shall be sworn or affirmed not to inquire or disclose how any elector shall have voted. In all cases of contested election in which paper ballots are required to be used, the ballots cast may be counted and compared with the list of voters, and examined under such safeguards and regulations as may be provided by law. Nothing in this section, however, shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election, *provided that secrecy in voting is preserved.*

Colo. Const. art. VII, § 8 (emphasis added).[3]

¶ 16 In this case, the district court determined that the election officials violated Article VII, Section 8 when they counted absentee ballots with the numbered stubs still affixed. More specifically, the district court found that "the election judges had access to the [voter] list throughout the course of the day of the Election, during which time they could have made a mental or physical note of the absentee ballot numbers corresponding to specific voters, and these same election judges proceeded to count the votes on the entirety of the absentee ballots with the ballot stubs (including ballot numbers) attached." Judgment at 21. Thus, although the district court found that there was no evidence that the election judges actually compared the voter lists with the numbered stubs, there was still an "opportunity to draw comparison during the counting with the previously observed list." Because there was a possibility that ballots could have been identified with particular voters, the district court concluded that Section 8's prohibition on "marked" ballots was violated and that, under our decision in *Taylor v. Pile*, it was required to void the election.

¶ 17 In considering whether the district court erred in voiding the election based on its finding that Section 8 was violated, we begin by examining the historical context in which the prohibition on "marked" ballots was added to the constitution. We conclude that the prohibition was adopted to address a particular practice—that of election judges permanently marking a voter's ballot with a number—not at issue in this case. We then consider whether our decision in *Taylor* requires that this recall election be voided, and conclude that it does not.

### 1. Development of Law Regarding Use of Paper Ballots

¶ 18 As recounted by the United States Supreme Court in *Burson v. Freeman*, under early colonial practice, government officials were elected by voice vote or by a showing of

---

**3.** The second paragraph of Section 8, which is not implicated in this case, provides:

When the governing body of any county, city, city and county or town, including the city and county of Denver, and any city, city and county or town which may be governed by the provisions of special charter, shall adopt and purchase a voting machine, or voting machines, such governing body may provide for the payment therefor by the issuance of interest-bear-

ing bonds, certificates of indebtedness or other obligations, which shall be a charge upon such city, city and county, or town; such bonds, certificates or other obligations may be made payable at such time or times, not exceeding ten years from date of issue, as may be determined, but shall not be issued or sold at less than par.

Colo. Const. art. VII, § 8.

hands. 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion). That voting scheme produced an open and public election "witnessed by all and improperly influenced by some." *Id.* at 200, 112 S.Ct. 1846. By the early 1800s, most states had adopted the paper ballot to avoid the opportunities for bribery and intimidation permitted by elections by voice or by a showing of hands. *Id.*

¶ 19 Although the paper ballot was an improvement over the elections by voice or by a showing of hands, problems with voter intimidation and bribery continued to threaten the integrity of the election. *Id.* at 200–01, 112 S.Ct. 1846. Under the unofficial ballot system, political parties often produced their own ballots for the voters. *Id.* at 200, 112 S.Ct. 1846. These ballots were printed with bright colors, distinctive designs, and emblems that could be recognized from a distance. *Id.* Vote buyers "could simply place a ballot in the hands of a bribed voter and watch until he placed it in the ballot box." *Id.* at 200–01, 112 S.Ct. 1846.

¶ 20 Concerns about voter intimidation and election fraud prompted many governments, foreign and domestic, to adopt procedures to secure ballot secrecy. In Australia, some provinces adopted a series of reforms, including an official ballot listing all candidates, published by the government, and polling booths with voting compartments to permit voters to cast their ballots privately. *Id.* at 202, 112 S.Ct. 1846. After a handful of jurisdictions in the U.S. adopted these reforms in 1888, other states joined in, and by 1896, the vast majority of states had adopted the Australian ballot system. *Id.* at 204–05, 112 S.Ct. 1846.

¶ 21 When Colorado attained statehood in 1876, Article VII, Section 8 of the Colorado Constitution required that "[a]ll elections by the people shall be by ballot." Colo. Const. art. VII, § 8 (1876). During the first fifteen years of statehood, however, unofficial paper ballots were brought to the polls by the

voter. The ballots could be written or printed and only had to contain the name and office of the candidates for whom the voter intended to vote. 1876 Colo. Sess. Laws 367–68, § 32. The form and appearance of the ballots were not regulated. *Id.*

¶ 22 In 1891, Colorado adopted the official ballot system through an act of the General Assembly. The act provided that "[a]ll ballots cast in elections for public officers or for the decision of any question submitted to electors, within this State, shall be printed and distributed at public expense." 1891 Colo. Sess. Laws 143, § 1. The act required each ballot to contain all of the candidates from each party on the same ticket, all ballots to be of uniform length and width, and each county or municipal clerk to use precisely the same type, quality, and tint of paper, and black ink for all ballots at an election. 1891 Colo. Sess. Laws 151, § 18. Additionally, the act required election officials to erect voting booths and guard rails to prevent the general public from coming within six feet of the voting booths. 1891 Colo. Sess. Laws 155–56, § 24.

¶ 23 Notably, the 1891 act required all ballots to have two detachable stubs, each printed with the number of the ballot and nothing else. 1891 Colo. Sess. Laws 151, § 18. The act also required an election official to detach and retain the top stub when the ballot was given to the voter. 1891 Colo. Sess. Laws 156, § 25. When the voter returned the folded, voted ballot, the election official confirmed that the voter returned the same ballot given to the voter by comparing the number of the second, or "duplicate stub," with the top stub number, and then removed the duplicate stub from the ballot. 1891 Colo. Sess. Laws 158, § 26.

¶ 24 Although these reforms were intended to protect a voter from intimidation when casting a ballot, the secrecy of a voter's ballot was not protected in the event of an election contest.[4] From the time Colorado entered into statehood and until 1946, Article VII,

---

4. The last sentence of the first paragraph of Article VII, Section 8 was added to the Colorado Constitution in 1905. *See* Colo. Const. art. VII, § 8 (1905) (stating, "Nothing in this section ... shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election, provided that secrecy in voting is preserved.")

Section 8 of the Colorado Constitution required that "every ballot voted shall be numbered in the order in which it shall be received, and the number be recorded by the election officers on the list of voters opposite the name of the voter who presents the ballot." Colo. Const. art. VII, § 8 (1876); *see also* Colo. Const. art. VII, § 8 (1905).

¶ 25 The 1891 act discussed above makes clear that the "numbering" of voted ballots, then required under the constitution, was quite distinct from the use of detachable stubs. Importantly, after removing both of the detachable stubs and writing the name of the voter in the poll list, the election official was required to then number each voted ballot (consecutively in the order the voted ballots were received). 1891 Colo. Sess. Laws 158, § 26. This number was required to be placed, in ink, on the top corner of the ballot itself. *Id.* The election official was then required to record that number next to the voter's name on the poll list. *Id.* The act required the numbered corner to be turned and pasted down to prevent the number from being visible. *Id.* In an election contest, this seal could be broken in order to identify a particular voter's ballot. *Id.*

¶ 26 Specifically, where illegal votes were cast in sufficient numbers to alter the election result, the illegal ballots could be identified by looking up the voter on the poll list and matching the number marked on the poll list with the number marked on the ballot. 1885 Colo. Sess. Laws 198, § 19. These voted ballots were then identified and the votes cast were deducted from the vote count. *Id.* Thus, in the event of an election contest, this practice—of numbering the actual ballot and recording that number with the voter's name on the poll list—permitted the content of a particular voter's ballot to be revealed to election officials and the public.[5]

¶ 27 In 1946, Article VII, Section 8 was amended by legislative referendum and vote of the people. The 1946 amendment eliminated the practice of permanently numbering ballots in order to identify particular voters' ballots in an election contest. Specifically,

the constitutional amendment removed the language requiring every voted ballot to be "numbered in the order in which it shall be received, and the number recorded by the election officers on the list of voters opposite the name of the voter who presents the ballot." *See* Colo. Const. art. VII, § 8 (1946). In its place, the amendment provided that "no ballots shall be marked in any way whereby the ballot can be identified as the ballot of the person casting it." *Id.*

¶ 28 During the next legislative session, the General Assembly enacted several statutory changes to conform voting procedures to this new constitutional language. Specifically, the General Assembly removed the requirement that election officials number each voted ballot in ink and record the ballot number in the poll list. 1947 Colo. Sess. Laws 435, § 229. The General Assembly also amended the provision governing the examination of the poll list and ballot box in an election contest to remove language that had permitted officials to identify particular ballots and deduct those specific votes. 1947 Colo. Sess. Laws 436, § 291. These amendments made clear that election officials were no longer permitted to identify a particular voted ballot by matching the name with the number permanently marked on the ballot.

¶ 29 In short, the 1946 legislatively referred amendment and accompanying statutory changes were designed specifically to repeal a practice under which election officials had permanently hand-numbered voted ballots to permit particular ballots to be identified during an election contest. The revised language of Article VII, Section 8 was never intended to govern the use of detachable stubs. As noted above, the procedures governing detachable stubs on ballots have long been governed by statute, not Article VII, Section 8. Indeed, the detachable stub requirement and the procedures for removing them are still governed by statute. *See, e.g.,* §§ 31–10–607; 31–10–1007.

### 2. Current Statutory Procedures for Casting Paper Ballots

¶ 30 Under the current Colorado Municipal Election Code, all ballots must be printed

---

5. We note that this Court's published opinions regarding election contests during this period often identified challenged voters by name and indicated how these individuals voted. *See, e.g., Israel v. Wood,* 98 Colo. 495, 56 P.2d 1324 (1936).

with two detachable stubs at the top of each ballot, each containing the ballot stub number. § 31–10–902(4), C.R.S. (2013). Section 31–10–606(5), C.R.S. (2013), requires an election official to retain the top stub when giving a paper ballot to a voter. When a voter is ready to cast his or her voted ballot, the voter shall give their folded ballot to the election judge, who must ensure that the ballot stub number corresponds to the stub number previously recorded in the voter registration list. The election judge then removes the duplicate stub and returns the ballot to the voter to deposit in the ballot box. § 31–10–607(1), (2). Section 31–10–1007(1) requires absentee ballots to be cast in the same manner as if the absent voter had been present in person, except that the election judge is required to deposit the ballot into the ballot box without unfolding it.

### C. Failure to Remove Ballot Stubs Here Did Not Require Voiding the Election

¶ 31 Sections 31-10-607 and 31-10-1007 were violated when the Town of Center election officials failed to remove the stubs from the absentee ballots before counting the ballots. Importantly, however, the election officials in this case did not "mark" the actual voted ballots with permanent numbers so that they could be identified with a particular voter in the event of an election contest. Rather, the ballots here had the statutorily-required detachable stubs containing a number corresponding to the voter registration list. Although the duplicate stubs were inadvertently left attached to the absentee ballots

during part of the counting process, these circumstances do not constitute a violation of the language in Article VII, Section 8 prohibiting voted ballots from being "marked in any way whereby the ballot can be identified as the ballot of the person casting it." Thus, although the election officials' actions violated statutory procedures governing ballot counting, they do not amount to a constitutional violation under Article VII, Section 8. We therefore conclude that the district court erred in setting aside the election on the ground that Article VII, Section 8 was violated.[6]

¶ 32 Nor can the remedy of voiding the election be justified under the election contest statutes, because the district court concluded that none of the enumerated causes of action in section 31-10-1301, C.R.S. (2103) were proven, and Jones did not cross-appeal on this issue.[7] The district court's findings have therefore become final and cannot serve as an alternative basis for us to uphold voiding the election.

### D. The District Court Erred in Setting Aside this Election based on *Taylor v. Pile*

█ ¶ 33 The district court also incorrectly applied *Taylor v. Pile* in concluding that our opinion in that case required it to void the recall election in this case. *Taylor* involved an election where officials "refused to permit electors to remove ... numbers from the ballots as they were cast." 391 P.2d at 672. In that case, we did not expressly consider whether the ballots were permanently marked with a number in a way that would

---

6. Because we determine that there was no violation of Article VII, Section 8, we decline to determine whether the district court erred in not reviewing the alleged constitutional violation under a substantial compliance standard. We have applied the substantial compliance standard to alleged violations of election statutes, *see Erickson v. Blair*, 670 P.2d 749, 755 (Colo.1983), but we have not imported this standard into our constitutional jurisprudence on this subject.

7. In an election contest, a trial court may set aside the result of an election under section 31-10-1307, C.R.S. (2013), where the contestor proves one of the enumerated causes of action in section 31-10-1301. See §§ 31-10-1301, -1307 (requiring a showing of fraud, undue influence,

or intentional wrongdoing that would change the outcome of an election in order to set an election aside). Here, the district court found no basis for setting aside the election on statutory grounds because "this election ... was fundamentally untainted by any substantive intentional error of procedure, free of any fraud or intentional violation of voting secrecy." To the extent the district court may have based its decision to void the election on a statutory secrecy violation, it was in error. There is currently no statutory guarantee of secrecy apart from the ballot casting/counting procedures. These procedures, if violated, would require voiding the election only where it is shown that there was fraud, undue influence, or intentional wrongdoing that would change the outcome of the election.

run afoul of Section 8's prohibition on marked ballots, as described above. Instead, we opined that, in a situation where "the undisputed fact was made to appear that all the ballots cast were not secret ballots, it was the duty of the court to declare the election void." *Id.* at 673. In other words, we suggested in *Taylor* that, where an entire election is not secret, it must be set aside. *See id.* ("[T]he secrecy of the ballot is guaranteed the citizen ....") *see also id.* (referring to the "[state] constitutional ... right to cast a secret ballot"); Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 197 (2002) ("Section 8's most important purpose is to guarantee a secret ballot.").

¶ 34 As the United States Supreme Court has recognized, a secret ballot ensures the "right to vote one's conscience without fear of retaliation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Critical to our comment in *Taylor*, then, was our assumption in that case that "all the ballots were not secret"; in other words that the election was conducted without a secret ballot. We determine that, when properly interpreted, *Taylor* suggests that an election may be voided only where the election was conducted without a secret ballot. Because there was a secret ballot at the time the voters voted in this case, we find that nothing in *Taylor* requires the recall election to be voided.

¶ 35 To the contrary, it is undisputed that the ballot was secret at the time both the in-person and absentee Town of Center voters voted. There was no credible evidence presented that voters were not free to vote as they wished or were intimidated in any way. The district court rejected the numerous statutory election challenges based on Jones' allegations of illegal votes, fraud, and malconduct, and those rulings have not been challenged in this proceeding.[8] In sum, there was no evidence that the secrecy or integrity of this entire election was put in jeopardy by the election judges' error in partially counting the absentee ballots with the numbered stubs still attached. The trial court therefore erred in voiding the recall election based upon *Taylor*.

¶ 36 A pair of decisions from the Supreme Court of South Carolina further illustrate our holding in this case. In *George v. Municipal Election Commission*, the Court found a violation of ballot secrecy where voters voted at tables in plain view of one another, rather than in voting booths, and where ballots could not be folded to conceal a voter's vote. 335 S.C. 182, 516 S.E.2d 206 (S.C.1999). The election challengers conceded that "no one testified he or she saw the vote made by another person, no one testified he or she refused to vote due to the method of voting, and no one testified he or she was confused or intimidated during the process." *Id.* at 207. But the Court found a violation of both the "statutory and constitutional right to a secret ballot" based on the fact that the pervasive lack of secrecy threatened the integrity of the entire election. *Id.* at 212.

¶ 37 In contrast, in *Taylor v. Town of Atlantic Beach Election Commission*, a case decided several years after *George*, six out of twenty-one challenged ballots were actually hand-written and signed by individual voters, making them plainly identifiable as the voters' ballots. 363 S.C. 8, 609 S.E.2d 500, 504 (S.C.2005). Other ballots of the twenty-one challenged were allegedly "allowed to be seen." *Id.* The Court emphasized the importance of ballot secrecy and concluded that proper election procedures were not followed. *Id.* at 505. Yet, it ultimately concluded that, unlike in *George*, "there was no systemic invasion of privacy ... which affected the fundamental integrity of the election and gave rise to a constitutional violation sufficient to set aside the election results." *Id.*

■ ¶ 38 These cases and our holding today reinforce the line drawn in *Taylor*—that voiding an election may be appropriate where the fundamental integrity of an election is compromised by the lack of a secret ballot. Based on the district court's findings in this case, we conclude that the fundamental in-

---

8. See ¶ 11 of this opinion for a summary of the district court's factual findings related to these statutory challenges.

tegrity of the Town of Center recall election was not called into question and, therefore, the district court erred in voiding the election.

## III.

¶ 39 Accordingly, we reverse the district court's judgment and return this case for entry of a judgment under section 13–10–1307 declaring that Sisneros, Garcia, and Martinez were duly elected.