FILED
United States Court of Appeals
Tenth Circuit

October 21, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITIZEN CENTER,

        Plaintiff-Appellant,

v.

SCOTT GESSLER, in his official
capacity as Colorado Secretary of
State; ANGELA MYERS, in her
official capacity as Larimer County
Clerk & Recorder; PAM
ANDERSON, in her official
capacity as Jefferson County Clerk
& Recorder; HILLARY HALL, in
her official capacity as Boulder
County Clerk & Recorder; JOYCE
RENO, in her official capacity as
Chaffee County Clerk & Recorder;
and TEAK SIMONTON, in her
official capacity as Eagle County
Clerk & Recorder,

        Defendants-Appellees.

No. 12-1414

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CV-00370-CMA-MJW)**

---

Robert A. McGuire, III, McGuire Bains LLC, Lone Tree, CO (Jeffrey David
Baines, McGuire Baines LLC, Denver, CO, on the briefs), for Plaintiff-Appellant.

David Hughes, Boulder County Attorney, Boulder, CO, and LeeAnn Morrill, First Assistant Attorney General, Office of the Attorney General for the State of Colorado, Denver, CO (Writer Mott and David Wunderlich, Assistant Jefferson County Attorneys, Golden, CO, David Ayraud and William G. Ressue, Larimer County Attorney's Office, Fort Collins, CO, Gillian Dale and Tom Lyons, Hall & Evans, Denver, CO, Bryan Treu, Eagle County Attorney, Eagle, CO, and Jennifer Davis, Chaffee County Attorney, Salida, CO, and John W. Suthers, Attorney General, with them on the briefs) for Defendants-Appellees.

———————————————

Before **HOLMES**, **McKAY**, and **BACHARACH**, Circuit Judges.

———————————————

**BACHARACH**, Circuit Judge.

In May 2012, election officials in six Colorado counties (Larimer, Jefferson, Boulder, Chafee, Eagle, and Mesa) had the theoretical ability to learn how individuals voted because the ballots were traceable. Citizen Center, a Colorado non-profit organization, sued the Secretary of State and the clerks for five of the six counties, contending that the use of traceable ballots violates members' federal constitutional rights involving: (1) voting, (2) free speech and association, (3) substantive due process, (4) equal protection, and (5) procedural due process.[1] In addition, Citizen Center has sued five of the clerks for violation of the Colorado Constitution.[2]

———————————————

[1] The suit was brought against the clerks for all of the six counties. But the Clerk for Mesa County (Ms. Sheila Reiner) settled with Citizen Center.

[2] Initially, the claims under the state constitution were also asserted against the Secretary of State. But, Citizen Center withdrew the state claims against the Secretary of State, admitting that they should have been

2

All defendants moved to dismiss for lack of standing, and the clerks included an alternative argument for dismissal under Federal Rule of Civil Procedure 12(b)(6). The district court dismissed the complaint on standing grounds without reaching the merits of the clerks' argument under Rule 12(b)(6). R. vol. 3, at 497.

This appeal presents three types of issues: (1) mootness, (2) standing, and (3) sufficiency of the allegations against the clerks under Rule 12(b)(6). We conclude:

- The claims are partially moot because the Secretary of State has adopted new regulations banning some of the challenged practices.

- Citizen Center has standing on the "live" parts of the claims involving denial of equal protection and procedural due process, but Citizen Center's alleged injury in fact is too speculative for standing on the "live" parts of the claims involving the right to vote, engage in free speech and association, and enjoy substantive due process.

- The first amended complaint failed to state a valid claim against the clerks for denial of equal protection or procedural due process.

These conclusions result in termination of all claims except the federal claims against the Secretary of State for denial of equal protection and procedural due process.

---

asserted only against the clerks. R. vol. 1, at 118; *see* R. vol. 3, at 496 (district court's acknowledgment that Citizen Center had conceded that the claims under the state constitution could not be maintained against the Secretary of State).

## I.    Traceable Ballots

Analysis of the claims requires an understanding of the balloting practices in the six Colorado counties, Citizen Center's theories, and the Secretary of State's regulatory changes designed to enhance ballot secrecy.

### A.    Challenged Balloting Practices

Citizen Center complains of the potential for election officials in six Colorado counties to trace ballots to individual voters. This potential allegedly exists because:

(1)    each ballot has a unique number or barcode,

(2)    some ballots may be unique among the ballots cast on an electronic voting machine, and

(3)    some ballots may be unique within a batch of ballots.[3]

R. vol. 1, at 25, 27-31, 33-34.

According to Citizen Center, ballots are traceable when they bear unique numbers or barcodes. Unique numbers or barcodes are used in

---

[3]    The clerks state that traceable ballots are used to: "(1) prevent[] election fraud by ensuring that ballots are not duplicated or double counted; (2) prevent[] human error by establishing an electronic means of preventing double counting; (3) ensure[] that problematic ballots (such as those with improper marks, under-votes, and over-votes) can be quickly reviewed by bi-partisan election judges to determine the intent of the voter; (4) allow[] the processing of the [voluminous number of] ballots... submitted in a general election in a timely and orderly fashion; (5) allow[] a thorough and accurate post-election audit to help ensure that every vote[] [has] been properly counted; (6) and conduct[] an accurate canvass, required by law, in which election staff must execute a very detailed reconciliation of the election and ensure accurate accounting of ballots printed, received, and counted." R. vol. 3, at 362; *see id.* at 351, 356.

three of the counties.  *Id.* at 31, 33-34.  In these counties, ballots are traceable because an election official who identifies a voter with a unique ballot can later identify the ballot as belonging to that particular voter.  *Id.* at 27-34.

Citizen Center also contends that election officials can trace ballots that are unique among those cast on an electronic-voting machine.  In each of the six counties, officials record the date of voting, the machine's unique identifier, and the precinct number or ballot style used by the voter.  *Id.* at 27, 29-30, 32-33, 35.  By comparing this information with available data, Citizen Center argues, election officials can trace a ballot whenever it is unique among the ballots cast on a particular voting machine.  *See id.* at 27-30, 32-35.

The potential for tracing also allegedly exists because some ballots may be unique within a single batch.  Four of the counties (Mesa, Larimer, Jefferson, and Boulder) process and store mail-in (absentee) ballots in discrete batches.  *Id.* at 25, 27, 29, 32.  Each batch is associated with a batch sheet listing the names, voter identification numbers, precinct numbers, ballot styles, and other information for the voters whose ballots are included in the batch.  *Id.* at 25, 27, 30, 32.  Because batches are relatively small, some ballots may be unique within the batch.  Thus, Citizen Center alleges that election officials will sometimes be able to

5

trace a ballot by comparing the content to information in the batch sheet. *Id.* at 25-26, 28, 30, 32.

B.    **Citizen Center's Theories**

Citizen Center's members include voters from the six counties who intend to "freely vote their conscience[s]" in upcoming elections. *Id.* at 38. But the members allegedly fear that their ballots will be traced and that votes are "subject to being identified by government officials and others at any time after an election." *Id.* at 41. Thus, Citizens Center fears that members may not "freely exercise their fundamental right to vote" because of the possibility of tracing. *Id.* at 42, 44.

Citizen Center contends that the counties' election procedures "substantially burden, infringe and chill" members' constitutional rights to: (1) vote, (2) engage in free speech and association, (3) enjoy substantive and procedural due process, and (4) enjoy equal protection. *Id.* at 42, 44-48, 51, 53.

C.    **Actual Tracing of Ballots**

Colorado election officials must swear "not to inquire or disclose how any elector shall have voted." Colo. Const. art. VII, § 8. Thus, all mail ballots are provided to voters with a secrecy envelope or sleeve to prevent officials from learning how a citizen voted. Colo. Rev. Stat. § 1-7.5-103(5).

Citizen Center alleges that election officials in three counties have either traced individual ballots or failed to adequately safeguard the secrecy of voters' ballots. According to Citizen Center, officials in Mesa and Larimer counties traced the ballots of identified public officials and publicized the ability to trace ballots. R. vol. 1, at 26, 28. And Jefferson County allegedly published the electoral choices of 30 identifiable voters for nearly a year and a half. *Id.* at 30-31; R. vol. 2, at 210.

## D. The Secretary of State's Regulatory Changes

The Secretary of State bears responsibility for regulating election procedures for each Colorado county. Colo. Rev. Stat. § 1-1-110(1) ("The county clerk and recorder . . . shall . . . follow the rules and orders promulgated by the secretary of state pursuant to this code."); *see* 8 Colo. Code Regs. § 1505-1:7.1 (requiring approval by the Secretary of State on all mail ballot plans).

Citizen Center challenges the constitutionality of voting procedures in the 2012 election. R. vol. 1, at 41. But the Secretary of State has revised its election regulations. *See* 8 Colo. Code Regs. § 1505-1. The current regulations: (1) prohibit counties from printing ballots with unique numbers or barcodes, (2) require counties using rotating numbers to "print at least ten ballots of each ballot style for each number," and (3) direct county clerks to "dissociate any batch number that could trace a ballot back to the specific voter who cast it from the counted ballots no later than

7

the final certification of the abstract of votes cast." *Id.* §§ 1505-1:4.8.4(a), 1505-1:7.5.8.

## II.  Mootness

The Defendants contend that the action is moot because:  (1) Citizen Center challenged only the 2012 election procedures and the election has passed, (2) the Secretary of State has adopted new regulations superseding the procedures being challenged, and (3) the action is prudentially moot. Clerks' Br. at 8-14; Sec'y's Br. at 30-34.  We reject the Defendants' first and third arguments.  But the new regulations moot the challenges to some of the balloting practices.

### A.    The Choice Between Jurisdictional Issues

Mootness and standing are jurisdictional.  *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).  Because "[t]here is no mandatory 'sequencing of nonmerits issues,'" we have "leeway 'to choose among threshold grounds for denying audience to a case on the merits.'"  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 585 (1999)).  We begin by addressing mootness.

### B.    The Requirement of a Live Controversy

"[T]he existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction."  *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996).  A federal court must

order dismissal for mootness if the controversy ends prior to a decision even if a justiciable controversy existed when the suit began. *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011). Because Citizen Center seeks only prospective equitable relief, past exposure to illegal conduct would not establish a live controversy in the absence of continuing ill effects. *See Beattie v. United States*, 949 F.2d 1092, 1093-94 (10th Cir. 1991) ("'[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974))).

### C.  The Defendants' Burden

Because the Defendants argue that there is no longer a live case or controversy, they must demonstrate mootness. *In re Paige*, 584 F.3d 1327, 1336 (10th Cir. 2009).

### D.  The 2012 Election

The clerks argue that the action is moot in part because: (1) Citizen Center challenged only the procedures in the 2012 presidential election, and (2) this election has come and gone. Clerks' Br. at 8-9. This argument misconceives the nature of the relief sought.

Generally, a claim for prospective injunction becomes moot once the event to be enjoined has come and gone. *See Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (holding that

9

the plaintiff's application to protest during the Olympics was moot because the Olympics had already taken place). But Citizen Center sought to enjoin the use of traceable ballots for all future elections. *See* R. vol. 1, at 39-40 (noting Citizen Center's members face injury in "other future elections"). Thus, the passing of the 2012 election did not render the action moot. *See Consumer Party v. Davis*, 778 F.2d 140, 146 n.12 (3d Cir. 1985) (noting that a request for a preliminary injunction, growing out of elections, did not become moot after the elections passed because the requested relief would apply to future elections).

### E.    New Regulations

The Defendants also assert that the Secretary of State's new regulations[4] render the case moot on constitutional and prudential grounds. In response, Citizen Center urges us to apply the voluntary-cessation exception. We conclude:

- The new regulations partially moot the case.

- Neither the voluntary-cessation exception nor the prudential mootness doctrine applies.

### 1.    Partial Mootness

Citizen Center challenges three types of county balloting practices: (1) use of a unique number or barcode; (2) use of a unique ballot among the ballots cast on a voting machine; and (3) use of a unique ballot within a

---

[4]    We analyze the current regulations, which took effect on December 30, 2013.

batch.  R. vol. 1, at 25, 27-31, 33-34.  Generally, an action becomes moot when someone challenges a regulation and it is repealed.  *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000).  But, a repeal does not moot the case when the remaining regulations allow continuation of the conduct being challenged.  *See id.*  Some of Citizen Center's challenges became moot with the new regulations.

The new regulations address some of the disputed practices by:  (1) barring counties from printing ballots with unique numbers or barcodes, and (2) requiring counties to dissociate batch numbers from ballots before final certification of the vote.  8 Colo. Code Regs. §§ 1505-1:4.8.4(a), 1505-1:7.5.8.

These regulations moot Citizen Center's challenges to:

(1)    the use of unique numbers and barcodes, and

(2)    the use of a unique ballot within a batch after final certification of the vote.

But the new regulations do not moot the remaining challenges.

The clerks point out that the new regulations require counties to print at least ten ballots of each ballot style for each number.  *Id.* § 1505-1:4.8.4; *see* Clerks' Br. at 11.  But this requirement does not moot the claims.  Though the counties will use ten copies of every ballot style, some ballots may remain traceable because they will be unique among the ballots

11

cast on a single voting machine or within a batch before certification. Therefore, Citizen Center's challenges are not moot with respect to the use of a unique ballot among the ballots cast on a voting machine and use of a unique ballot within a batch before final certification of the vote.

## 2.    The Voluntary-Cessation Exception

Citizen Center argues that we should apply the voluntary-cessation exception to the mootness doctrine. Citizen Ctr.'s Reply Br. at 8-11. This exception does not apply.

A defendant's voluntary cessation of a challenged practice rarely moots a federal case because a "'party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1149 (10th Cir. 2007) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). Nonetheless, a defendant's voluntary cessation moots a case when a challenged regulation is repealed and the government does not openly express intent to reenact it. *Camfield v. City of Okla. City*, 248 F.3d 1214, 1223-24 (10th Cir. 2001). But a case is not moot if a challenged regulation is repealed and there are "'*clear showings* of reluctant submission [by government actors] and a desire to return to the old ways.'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) (alteration in

12

original) (quoting 13C Charles Alan Wright, Arthur M. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.6, at 311 (3d ed. 2008)).

Citizen Center makes two arguments:

(1)    The Secretary of State has revised its regulations multiple times during this litigation, allowing emergency regulations to lapse.

(2)    The clerks have expected some regulations to be "overturned or modified."

Citizen Ctr.'s Reply Br. at 10-11. We reject both arguments.

First, the Secretary of State's revisions do not indicate a desire to return to old ways. With each revision, the Secretary has enacted stricter or substantively similar regulations, and Citizen Center does not suggest that the new regulations will be watered down.[5]

Second, the clerks have not threatened to defy the Secretary's new regulations. Disagreeing with a regulation is not the same as refusing to follow it, especially when the clerks' ballot plans require approval by the Secretary of State. Thus, the voluntary-cessation exception does not apply and Citizen Center's challenges are moot with respect to the use of unique numbers and batching after certification of the vote.

---

[5]    Although the Secretary of State allowed the emergency regulations to lapse between December 2012 and May 2013, Citizen Center does not claim that any elections took place during that time. *See* Citizen Ctr.'s Reply Br. at 4.

13

### 3. Prudential Mootness

Finally, the clerks urge us to apply the prudential mootness doctrine to the portion of the case that would otherwise survive. Clerks' Br. at 13. The doctrine of prudential mootness does not apply.

A case is prudentially moot if "circumstances [have] changed since the beginning of litigation that forestall any occasion for meaningful relief." *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997). We may decline to grant relief when the "government . . . has already changed or is in the process of changing its policies or where it appears that any repeat of the actions in question is otherwise highly unlikely." *Bldg. & Const. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).

The regulatory changes would not halt the threat of traceable ballots when voters use unique numbers or barcodes and the ballots are unique within a batch prior to final certification of the vote. Thus, a judgment for Citizen Center could provide meaningful relief. In these circumstances, the prudential mootness doctrine does not apply.

### F. Conclusion

Enactment of the current regulations moots the claims involving:

(1)    the use of unique numbers and barcodes on ballots, and

(2)    the use of a unique ballot within a batch after certification of the vote.

14

But the new regulations continue to allow use of unique ballots on an electronic voting machine and batching practices before final certification. Thus, Citizen Center's challenges to these practices are not moot.

## III. Standing

As discussed above, a live controversy remains on the use of a unique ballot on a single voting machine and pre-certification batching practices. We therefore address Citizen Center's standing to challenge these procedures. In doing so, we conclude that Citizen Center lacks standing on the claims involving members' rights to vote, engage in free speech and association, and enjoy substantive due process.

### A. Standard of Review

The district court dismissed the entire complaint for lack of standing. R. vol. 3, at 497. We review that decision de novo. *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996). In conducting de novo review, however, we must assume that the amended complaint is true and construe the allegations in favor of Citizen Center. *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013).

### B. Elements of Constitutional Standing

Constitutional standing involves three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Citizen Center can pursue its claims only if its members would have standing to sue in their own right. *Hunt v. Wash.*

15

*State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Thus, we must consider whether the members could sue on their own.

### 1. Identification of Members

The Secretary of State challenges the ability of any members to sue, arguing that Citizen Center failed to identify a single member who was harmed. Sec'y of State's Br. at 20. The district court did not address this challenge. Nonetheless, we can affirm the dismissal on any ground supported by the record. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1178 n.4 (10th Cir. 2007). Thus, we will address the Secretary of State's challenge involving identification of the Citizen Center members.

For purposes of argument, we can assume that Citizen Center bore an obligation to identify at least some of the members who were harmed. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Even with this assumption, we would conclude that Citizen Center has satisfied its obligation by identifying members being harmed.

In addressing this issue, we can review the entire record to assess Citizen Center's standing. *See N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 16 (1st Cir. 1996). In the record on appeal, Citizen Center presented affidavits identifying eleven individuals harmed by the use of traceable ballots. R. vol. 2, at 250-57; R. vol. 3, at 394-415. And these affidavits were in the district court's record at the time of the ruling

16

on the motion to dismiss. Thus, we conclude that Citizen Center has sufficiently identified its individual members for purposes of standing.

Because the affected members are sufficiently identified, we address whether Citizen Center has adequately alleged the constitutional elements of standing: injury in fact, causation, and redressability.

## 2. Injury in Fact

Injury in fact involves invasion of a legally protected interest that is concrete, particularized, and actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S, 555, 560-61 (1992); *Clapper v. Amnesty Int'l USA*, ___ U.S. __, 133 S. Ct. 1138, 1147 (2013). An imminent or "threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Clapper*, ___ U.S. __, 133 S. Ct. at 1147 (internal quotation marks omitted).

The district court determined that no injury in fact existed because absolute anonymity in voting is not a "legally protected federal interest." R. vol. 3, at 474-75. The clerks defend this conclusion. Clerks' Br. at 16 (quoting R. vol. 3, at 472).

We reject the court's rationale because it conflates standing with the merits. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." *Initiative & Referendum Inst. v.*

17

*Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc). Rather, we must assume for purposes of the standing inquiry that each claim is legally valid. *Id.*

Though we do not consider the merits in connection with standing, we do consider whether the plaintiffs have a legal right to do what is allegedly being impeded. *Id.* at 1093. For example, a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime. *Id.*

We must apply these principles to Citizen Center's theories of injury, analyzing the allegations in the amended complaint to determine if they would constitute a concrete, particularized invasion of a right held by members.

### a. Citizen Center's General Theories of Injury

Citizen Center alleges injury to members based on their

- desire to freely vote their consciences and

- fears that government officials might learn how members voted by tracing their ballots.

R. vol. 1, at 38-45.

This claim suggests two potential injuries:

1. the risk that election officials might determine how a member voted; and

2. a chilling effect on the members considering whether to vote.

Citizen Ctr.'s Opening Br. at 16-19. These alleged injuries do not support standing.

### i. Risk that Election Officials Might Determine How a Member Voted

Citizen Center alleges an injury in fact from the risk that election officials could determine how a member voted. *Id.* at 18. This allegation does not involve an injury in fact.

To address this allegation, we must consider how this risk would be affected by the use of traceable ballots. Citizen Center does not assert an "abstract, freestanding right" to an untraceable ballot. Instead, Citizen Center claims that the clerks' use of traceable ballots burdens other rights (the right to vote, engage in free speech, exercise the right to a secret ballot, enjoy equal protection, and enjoy due process). Each of these rights would allegedly be affected because of the risk that an election official might trace a ballot and discover how a member voted.

But that risk is speculative because of existing safeguards in the Colorado Constitution. For example, that constitution forbids election officials from inquiring about how a person voted. Colo. Const. art. VII, § 8.

Citizen Center alleges that these safeguards might not prevent election officials from tracing ballots and learning how members voted. *See* R. vol. 1, at 28-31, 33-34. According to Citizen Center, this

19

possibility is real because election officials occasionally traced the ballots of public officials and the Jefferson County Clerk once disclosed the electoral choices of 30 unnamed, but identifiable, voters. *Id.* at 26, 28, 30-31.

This possibility is speculative, for Citizen Center does not allege that

- its members were among those whose ballots were traced, or

- election officials are likely to trace any of the members' ballots.

In the absence of these allegations, Citizen Center simply suggests that election officials might trace ballots and violate the Colorado Constitution by investigating the electoral choices of particular individuals. This sort of speculation does not suffice for standing. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (standing cannot be based on speculation that the plaintiff might be subjected to an illegal chokehold by a police officer); *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974) (speculative risk of arrest is not an injury in fact). Thus, an injury in fact cannot come from the risk that officials might trace a ballot.

Relying on two cases from other circuits, Citizen Center argues that an injury in fact arises from the risk that election officials might trace ballots and disclose how a member voted. Citizen Ctr.'s Opening Br. at 16; *see Stewart v. Blackwell*, 444 F.3d 843, 854 (6th Cir. 2006), *vacated*,

20

473 F.3d 692 (6th Cir. 2007) (en banc) (per curiam); *Greidinger v. Davis*, 988 F.2d 1344, 1352 (4th Cir. 1993). The two cases are distinguishable.

In *Greidinger v. Davis*, the state conditioned registration to vote on disclosure of the voter's social security number. *Id.* at 1345. The court did not expressly address standing, and the burden on the *Greidinger* plaintiff differs from the burden on Citizen Center's members.

The *Greidinger* plaintiff refused to supply his social security number to election officials, who then denied his application for voter registration. 988 F.3d at 1345-46. The Fourth Circuit Court of Appeals concluded that the state's requirement provided a condition on the plaintiff's right to vote. *Id.* at 1352.

Our case is different. In *Greidinger*, the plaintiff was not allowed to vote. *Id.* at 1345-46. Here, none of the Citizen Center members have been told that they cannot vote. Instead, Citizen Center argues only that the use of traceable ballots discourages voting. With the difference in circumstances and absence of any discussion of standing, *Greidinger* provides little guidance for our determination of standing.

The injury in *Stewart v. Blackwell* stemmed from deficiencies in voting equipment. *Stewart*, 444 F.3d at 846. A Sixth Circuit Court panel concluded that the plaintiffs had standing because the deficiencies made it

"inevitable" that mistakes had taken place and would continue. *Id.*[6] Here, the Citizen Center members cannot plausibly argue that their votes will inevitably be traced. Instead, the members can only speculate about this possibility.

Unlike the injuries at issue in *Greidinger* and *Stewart*, the alleged injury here may never take place. For this risk of injury to take place, three things would need to occur:

1. At least one member would vote.

2. One of the clerks would trace that member's ballot.

3. The clerk would inquire into (and possibly reveal) the electoral choices after tracing the ballot.

This series of possibilities is too speculative to confer Article III standing. *See Clapper v. Amnesty Int'l USA*, ___ U.S. ___, 133 S. Ct. 1138, 1147 (2013) ("[W]e have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." (second alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))). Consequently, Citizen Center lacks standing based on the potential for election officials to determine how a member voted.

---

[6] The Sixth Circuit Court of Appeals later vacated the panel opinion because the case had become moot. *Stewart v. Blackwell*, 473 F.3d 692 (6th Cir. 2007) (en banc) (per curiam).

### ii. The Chilling Effect on Members

Citizen Center also alleges injury in part from the risk that traceable ballots might chill members from freely voting their consciences. Citizen Ctr.'s Opening Br. at 18-19. This alleged injury is not sufficiently concrete to justify standing.

The Supreme Court has never upheld standing based solely on a governmental policy lacking compulsion, regulation, or constraints on individual action. *See Clapper v. Amnesty Int'l USA*, ___ U.S. ___, 133 S. Ct. 1138, 1153 (2013) (stating that the Supreme Court has never held that "plaintiffs can establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part").

To the contrary, the Supreme Court held in *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972), that a chilling effect does not suffice as an injury in fact. There, the plaintiffs invoked the First Amendment, alleging a chilling effect from the existence of investigative activity. *Laird*, 408 U.S. at 10. The Supreme Court rejected this argument: "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13-14.

We interpreted *Laird* in *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc). In *Initiative and Referendum Institute*, we addressed a first amendment challenge to a state

23

constitutional provision. *Initiative & Referendum Inst.*, 450 F.3d at 1085. Based on *Laird*, we required the plaintiffs to present evidence that they had intended to refrain from the desired activity because of a credible threat that the government would enforce the restriction. *Id.* at 1089.

This requirement is missing here because Citizen Center does not provide plausible allegations that members intend to refrain from voting because of the possibility that their ballots might be traced. Instead, the members indicate in the amended complaint that they *do* intend to vote despite the possibility of tracing. R. vol. 1, at 38. There Citizen Center alleges that its members include electors who "intend to freely vote their conscience in the 2012 primary and general, special district, municipal and coordinated elections, and elections held thereafter in their respective counties." *Id.*[7]

Citizen Center's alleged chill is too conjectural to establish an injury in fact. *See Laird*, 408 U.S. at 13-14 n.7 ("Even assuming a justiciable controversy, if respondents themselves are not chilled . . . [they] clearly lack that 'personal stake in the outcome of the controversy' essential to standing." (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962))).

---

[7] Later, Citizen Center appeared to retreat from this allegation. For example, at a hearing, Citizen Center's counsel stated that whether members would refrain from voting was "open to question" and that some members were "considering not voting." R. vol. 3, at 441. And at oral argument in our appeal, Citizen Center's counsel stated that members were "concerned" and might not vote their consciences. Oral Argument at 11:34-13:57.

24

Accordingly, Citizen Center lacks standing to pursue a claim that members suffer a chilling effect.

**b.    The Equal Protection Claims**

For the federal and state equal protection claims, Citizen Center alleges an additional injury in fact:  the unequal imposition of the risk of a traceable ballot and related ability to discover how a member voted, depending on the location of the voter's residence.  Citizen Ctr.'s Opening Br. at 17.  At the pleading stage, this allegation is sufficient for an injury in fact on the equal protection claims.

Unequal treatment can serve as an injury in fact.  *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012); *see also* 13A Charles Alan Wright, Arthur R. Miller, & Edward C. Cooper, *Federal Practice and Procedure* § 3531.6, at 454 (2008) ("The inequality itself is an injury that is remedied by restoring equality.").  We applied this principle to voters in *American Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008).  There we held that in-person voters had standing to challenge a photo identification requirement placed on individuals who voted in person, but not by absentee ballot.  *Santillanes*, 546 F.3d at 1318-19.  The injury in fact consisted of the unequal treatment between in-person and absentee voters.  *Id.* at 1319.

Like the in-person voters in *Santillanes*, Citizen Center alleges an injury in fact based on the difference in treatment.  Members who live in

25

counties that use traceable ballots are treated differently than voters living in counties that use untraceable ballots. *See* R. vol. 1, at 37 (alleging that Pitkin County protects secrecy in voting). Through these allegations, Citizen Center has sufficiently pleaded an injury in fact from the unequal treatment between individuals living in counties that use traceable ballots and counties that use untraceable ballots. *See Santillanes*, 546 F.3d at 1319 (stating that "[s]tanding is not a proxy for ruling on the merits" and that the "unequal treatment of in-person voters vis-à-vis absentee voters is sufficient injury to confer standing" at the summary-judgment stage).

### c. The Claims Involving Procedural Due Process

Citizen Center claims denial of procedural due process under the federal and state constitutions, relying on the alleged loss of ballot secrecy as protected in the Colorado Constitution. Colo. Const. art. VII, § 8; R. vol. 1, at 45-46, 50, 55. For the procedural due process claims, Citizen Center relies on an additional injury in fact consisting of the violation of members' state constitutional rights (art. VII, § 8 and art. II, § 25).

These claims are based on the absence of safeguards to protect the liberty interest in secrecy of the ballot secured in the Colorado Constitution. R. vol. 1, at 45-46, 55-56. This injury is concrete and cognizable.

26

### 3.    Causation

The clerks argue that Citizen Center cannot show causation because it lacks an injury in fact. Clerks' Br. at 38. This argument conflates causation with injury in fact. The two are independent elements of constitutional standing. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 291 (6th Cir. 2006). Citizen Center has sufficiently alleged causation.

### 4.    Redressability

An injury is redressable if it is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The clerks and the Secretary of State argue that Citizen Center has not shown redressability. We disagree.

#### a.    The Clerks' Arguments

The clerks separately challenge redressability on the claims involving procedural due process and equal protection.

#### i.    Procedural Due Process

On the claims involving procedural due process, the clerks argue that Citizen Center cannot show redressability because

- it is asking for an injunction on practices no longer in place, and

- Citizen Center has not explained how the clerks "could satisfy their constitutional or statutory obligations" without the challenged practices.

Clerks' Br. at 38-39.  We reject both contentions.

The clerks' first contention is, in substance, one of mootness.  We reject that argument above because the clerks continue to implement some of the challenged practices.

We assume, for the sake of argument, that the clerks' second contention is potentially viable as a redressability argument.  But the amended complaint does not support the clerks' argument:  There Citizen Center alleges that another Colorado county uses untraceable ballots and manages to comply with the state constitution. *See* R. vol. 1, at 37 (alleging that Pitkin County has complied with the Colorado Constitution without violating secrecy in voting).  Through this allegation, Citizen Center has adequately pleaded facts indicating that the clerks could avoid using traceable ballots.

With this allegation, the proposed injunction would be likely to provide redress because an injunction against the use of traceable ballots would remedy the alleged denial of procedural due process.  Thus, we conclude that the claims involving procedural due process are redressable against the clerks.

**ii.    Equal Protection**

On the equal protection claims, the clerks argue that they lack the power to redress the alleged injury.  We disagree.

28

The alleged injury involves inequality in the ballot processes for voters in Pitkin County and voters in five other Colorado counties. The court could remedy this injury by enjoining the clerks in the five counties from conducting elections in a manner that would allow the use of traceable ballots. *See Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (stating that a denial of equal treatment can be remedied by extending benefits to the disfavored class). If judicial relief would prevent the five counties from using traceable ballots, the alleged inequality would disappear. Thus, the equal protection claims are redressable against the clerks.

### b.    The Secretary of State's Argument

The Secretary of State denies authority to remedy the alleged infirmities. Sec'y's Br. at 27-30. We reject this argument.

Under Colorado law, the clerks must consult with the Secretary of State, whose approval is required for any ballot plan. Colo. Rev. Stat. § 1-1-110(1); 8 Colo. Code Regs. § 1505-1:7. Because the Secretary of State's approval is required before the clerks can implement a ballot plan, the federal claim for denial of procedural due process is redressable against the Secretary of State. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 967 (10th Cir. 2006) (holding that the plaintiffs had shown a redressable injury because the court could enjoin the defendant from approving a project that would otherwise cause an injury). Despite the

29

Secretary's arguments, we cannot assume the clerks will proceed without the required approval. *See Int'l Union Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 291-92 (1986) (refusing to assume that agencies would disobey a directive by the Secretary of Labor).

## C.    Vagueness or Generality of the Request for a Secret Ballot

The clerks argue that Citizen Center's request for a "secret ballot" is too "vague" or "generalized" for constitutional standing.[8] Clerks' Br. at 39-40. This argument, consisting only of a single sentence and string-cite, is invalid.

Citizen Center identified the right being invoked (a secret ballot); thus, the claim is sufficiently specific for constitutional standing. *See FEC v. Akins*, 524 U.S. 11, 24-25 (1998) (holding that the inability to obtain information, in relation to voting, is "sufficiently concrete and specific" for constitutional standing); *see also Bishop v. Bartlett*, 575 F.3d 419, 425 (4th Cir. 2009) ("The deprivation of the right to vote is . . . a concrete harm, and thus its widely shared nature does not preclude a finding that [one of the plaintiffs] has suffered an injury in fact." (citations omitted)). And the widely shared nature of the injury would not preclude

---

[8]    We assume, for purposes of argument, that the generalized nature of a request could affect constitutional standing (as opposed to prudential standing). *Cf. Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 n.4 (10th Cir. 2000) (noting the tension in Supreme Court case law on whether the generalized nature of a grievance affects constitutional standing or prudential standing).

constitutional standing. *See Akins*, 524 U.S. at 23. Thus, we reject the clerks' argument based on the vagueness or generality of the request for a secret ballot.

## IV. The Clerks' Motion to Dismiss for Failure to State a Valid Claim

As discussed above, Citizen Center has standing on the claims against the clerks and Secretary of State for denial of equal protection and procedural due process.

Invoking Rule 12(b)(6), the clerks moved in the alternative for dismissal based on the failure to state a valid claim. Thus, we may affirm the dismissal in favor of the clerks if the denial of procedural due process and equal protection claims was deficient under Rule 12(b)(6).[9] *Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1290 (10th Cir. 2001). In applying Rule 12(b)(6), we accept all well-pleaded allegations in the amended complaint and view them in the light most favorable to Citizen Center. *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014). We conclude that Citizen Center's allegations failed to state a valid claim for denial of procedural due process or equal protection.

### A. Procedural Due Process

The claim involving procedural due process is facially deficient.

---

[9] The Secretary of State did not move for dismissal under Rule 12(b)(6). Thus, we need not address whether the claims against the Secretary of State would have survived a motion to dismiss under Rule 12(b)(6). *See Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 304 n.6 (4th Cir. 2000).

Citizen Center must satisfy two elements on the claim involving procedural due process: (1) a constitutionally protected liberty or property interest, and (2) a governmental failure to provide an appropriate level of process. *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir. 2008); *Colo. Dep't of Pub. Health v. Bethell*, 60 P.3d 779, 786 (Colo. App. 2002). Because Citizen Center claims a liberty interest under the state constitution, we determine the scope of that liberty interest by reference to the state constitution. *Montero v. Meyer*, 13 F.3d 1444, 1447 (10th Cir. 1994). Doing so, we hold that Citizen Center lacks a liberty interest in an untraceable ballot.

Citizen Center has two live types of traceability claims: (1) the use of potentially unique ballots; and (2) the use of potentially unique ballots within a batch before certification. These uses would not implicate a right safeguarded by the Colorado Constitution, for it prohibits only the use of unique numbers to identify a voter in the event of an election contest.

The Colorado Constitution provides:

> All elections by the people shall be by ballot, and in case paper ballots are required to be used, no ballots shall be marked in any way whereby the ballot can be identified as the ballot of the person casting it. The election officers shall be sworn or affirmed not to inquire or disclose how any elector shall have voted. In all cases of contested election in which paper ballots are required to be used, the ballots cast may be counted and compared with the list of voters, and examined under such safeguards and regulations as may be provided by law.

32

Colo. Const. art. VII, § 8.

Colorado courts have narrowly interpreted this language. *See Jones v. Samora*, 318 P.3d 462, 470 (Colo. 2014); *see also Marks v. Koch*, 284 P.3d 118, 122 (Colo. Ct. App. 2011) (determining that secrecy in voting was preserved when the elector's identifying marks are kept secret). Under this interpretation, voter secrecy is preserved when election officials do not actually learn how an individual voted. *See Marks*, 284 P.3d at 122 ("[W]e conclude that the phrase 'secrecy in voting' . . . protects from public disclosure of the identity of an individual voter and any content of the voter's ballot that could identify the voter."). And the provision against unmarked ballots simply bars election officials from marking ballots with unique numbers. *See Jones*, 318 P.3d at 470. Thus, traceability alone does not violate Colorado's guarantee of ballot secrecy.

In *Jones v. Samora*, the Colorado Supreme Court held that election officials' use of traceable ballots did not violate the Colorado Constitution. *Id. Jones* involved election officials' failure to remove ballot stubs from absentee ballots. *Id.* at 465. With the stubs intact, the ballots became traceable because election officials had access to a list of ballot stub numbers that corresponded to the names and addresses of the voters. *Id.* But "no one actually took this opportunity to violate voter secrecy." *Id.* at 466. Thus, although the ballots in *Jones* were traceable, the Colorado

33

Supreme Court held that the Colorado Constitution was not violated. *Id.* at 470.

Because the Colorado Constitution does not protect against traceable ballots, Citizen Center lacks a protected liberty interest. *See Blake v. Papadakos*, 953 F.2d 68, 73 n.5 (3d Cir. 1992) (noting that a procedural due process claim, based on a deprivation of a state property or liberty interest, must fail when the state supreme court determined that no such state interest exists). And without a protected liberty interest, the federal and state claims for denial of procedural due process fail as a matter of law. *See, e.g., Curtis Ambulance of Fla., Inc. v. Bd. of Cnty. Comm'rs of Shawnee Cnty., Kan.*, 811 F.2d 1371, 1375 (10th Cir. 1987) (federal right to procedural due process); *People, ex rel. A.W.R., a Child*, 17 P.3d 192, 195 (Colo. App. 2000) (Colorado's right to procedural due process under art. II, § 25 of the state constitution); *cf. People v. Zinn*, 843 P.3d 1351, 1353 n.3 (Colo. 1993) ("In view of the circumstances of this case, the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution and of article II, section 25 of the Colorado Constitution may be deemed co-extensive.").

## B.    Equal Protection

The equal protection claims are based on inequality between the balloting processes in different Colorado counties. Because Citizen Center has not alleged that a county clerk discriminated between voters in the

34

same county, the amended complaint does not suggest an equal protection violation by any of the county clerks.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). In the context of voting, the Supreme Court held in *Dunn v. Blumstein* that citizens enjoy "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." 405 U.S. 330, 336 (1972).

"The crucial phrase in *Dunn* is 'in the jurisdiction,'"[10] for each Colorado county is its own "jurisdiction."[11] Thus, in our case, the Equal

---

[10] *Duncan v. Coffee Cnty.*, 69 F.3d 88, 93 (6th Cir. 1995).

[11] We have not addressed in a published decision whether each Colorado county constitutes its own jurisdiction for purposes of the Equal Protection Clause. On this issue, however, we are swayed by numerous authorities reflecting the common-sense notion that counties operate as independent jurisdictions or political subdivisions. *See* 6 *West's Encyclopedia of American Law* 293 (1998) ("[C]ounties . . . are separate jurisdictions to the extent that they have powers independent of the federal and state governments."); *Hobock v. Grant Cnty.*, No. 99-2194, 2000 WL 807225, at *2 (10th Cir. June 23, 2000) (unpublished) ("Counties in New Mexico operate as independent political subdivisions."); *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 917 (9th Cir. 1991) (stating that two adjacent counties constituted "separate jurisdiction[s]"); *Hutto v. S.C. Ret. Sys.*, 899 F. Supp. 2d 457, 467 (D.S.C. 2012) (referring to counties as "independent political subdivisions"); *Mochizuki v. King Cnty.*, 548 P.2d 578, 580 (Wash. App. 1976) (per curiam) ("Counties are considered separate political subdivisions" and are not "considered [agencies] of the state.").

35

Protection Clause requires only that each county treat similarly situated voters the same.

That took place here because in each jurisdiction (county), every voter was treated alike. Thus, the allegations in the amended complaint would not suggest a violation of the right to electoral participation equally with others in the same jurisdiction. *See Duncan v. Coffee Cnty.*, 69 F.3d 88, 93 (6th Cir. 1995) (rejecting an equal protection claim because each voter in the school district was treated alike; disparities with electoral processes in other school districts in the county were immaterial); *Angel v. City of Fairfield*, 793 F.2d 737, 740 (5th Cir. 1986) (holding that an equal protection claim was facially deficient because all qualified voters in the city were treated alike).

Citizen Center would expand the right to include equal participation between counties, arguing that voters in different counties must be treated alike. As discussed above, Citizen Center's theory would go beyond the right to intra-jurisdictional equality recognized in *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

Even if we were to accept Citizen Center's theory in the abstract, it would fail here against the county clerks. For the claims against the clerks to succeed, Citizen Center would need to allege a basis to hold a county clerk liable for inter-county disparities. *See Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("[T]he proponent of the equal protection

36

violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-a-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile.").  No such basis exists in the amended complaint.

Rather, Citizen Center argues that the different treatment resulted from the actions of different county clerks, each a distinct governmental entity.  But each county clerk had power only within his or her county. *See* Colo. Rev. Stat. § 1-1-110(1); *see also Union Pac. R. Co. v. Alexander*, 113 F. 347, 352-53 (D. Colo. 1901) (holding that the Colorado Constitution did not authorize a county assessor "to perform the duties of his office outside the county for which he was elected").  With this limitation of authority, none of the county clerks could have violated the Equal Protection Clause by failing to match what another clerk had done in a different county.

In the absence of an allegation that a county clerk treated voters in a single county differently, Citizen Center failed to state a valid equal protection claim against any of the county clerks.[12]

---

[12]    We are considering only the equal protection claims against the five county clerks, not the Secretary of State. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 471 (6th Cir. 2008) (distinguishing between a potential claim against county officials and a claim asserted against the Secretary of State for discrepancies in the statewide voting system).

## V. Conclusion

On the standing issues, we conclude that Citizen Center:

- lacks standing on its claims regarding denial of substantive due process and the rights to vote and to free speech,

- has standing on the federal claims against the Secretary of State and the clerks for denial of procedural due process and equal protection, and

- has standing on the state claims against the clerks for denial of procedural due process and equal protection.

Thus, we affirm dismissal of the claims involving denial of substantive due process, the right to vote, and the right to free speech.

These conclusions would leave the claims involving denial of procedural due process and equal protection. For these claims, we agree with the clerks' alternative argument for affirmance under Rule 12(b)(6).

But the Secretary of State did not move for dismissal under Rule 12(b)(6). Thus, we reverse the dismissal of the federal claims against the Secretary of State for denial of procedural due process and equal protection. On these claims, we remand for further proceedings.